[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Gideon*, Slip Opinion No. 2020-Ohio-6961.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

**SLIP OPINION NO. 2020-OHIO-6961**

**THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v*. JAMES A. GIDEON, APPELLEE AND CROSS-APPELLANT.**

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Gideon*, Slip Opinion No. 2020-Ohio-6961.]**

*Medical license is a property right and threatened loss of the license is a form of coercion—R.C. 4731.22(B)—Coercion is not sufficient to warrant the suppression of statements made during a medical-board investigative interview unless defendant's belief that he would lose his license if he failed to participate in the medical-board interview and answer questions truthfully is both subjectively believed and objectively reasonable—Court of appeals erred by finding that assignment of error relating to the sufficiency-of-the-evidence claim was moot under App.R. 12(A)(1)(c)— Court of appeals' judgment reversed and cause remanded.*

(No. 2019-1104—Submitted August 4, 2020—Decided December 15, 2020—

Reconsideration Granted and Slip Opinion Reissued December 31, 2020.[1])

APPEAL and CROSS-APPEAL from the Court of Appeals for Allen County,

Nos. 1-18-27, 1-18-28, and 1-18-29, 2019-Ohio-2482.

_____

STEWART, J.

{¶ 1} In Ohio, a medical doctor has a statutory duty to answer truthfully questions posed by an investigator of the state medical board. The question presented in this appeal is whether the state may use incriminating answers given by a doctor during a medical-board investigation in a subsequent criminal prosecution of that doctor. We conclude that a medical license is a property right and that the threatened loss of the license is a form of coercion that can compromise the United States Constitution's Fifth Amendment privilege against self-incrimination. That said, in order for coercion to be sufficient to warrant the suppression of statements made during a medical-board investigative interview, first, the person making the statements must subjectively believe that asserting the privilege against self-incrimination could cause the loss of the person's medical

_____

1. On December 15, 2020, this court issued its judgment and original opinion in this case. Appellee and cross-appellant, James Gideon, filed a motion for reconsideration asserting as follows:

(1)  This court incorrectly deferred to the trial court's legal conclusion regarding both prongs of the *Graham* test (for adjudicating *Garrity* claims), *see State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116; *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); and
(2)  This court should clarify its remand order to require the Third District Court of Appeals to adjudicate Gideon's other assignments of error because this court's decision "un mooted" his remaining assignments of error.

We grant Gideon's motion to reconsider. This reissued opinion clarifies that this court conducted an independent review when we reached the conclusion that Gideon did not satisfy the *Graham* test. In addition, the opinion clarifies our previous remand language to instruct the court of appeals to consider Gideon's other assignments of error that were deemed moot.

license, and second, that belief must be objectively reasonable. In this case, the doctor's belief that he could lose his medical license if he refused to answer truthfully questions posed by the medical-board investigator was not objectively reasonable. Because the court of appeals reached a contrary conclusion and held that statements made by the doctor were inadmissible at trial, we reverse.

{¶ 2} We also conclude that the court of appeals erred by determining that its remand order mooted an assignment of error relating to the sufficiency of the evidence. An assignment of error challenging the sufficiency of the evidence is potentially dispositive of a defendant's conviction and may not be rendered moot by a remand on any other assignment of error.

**Factual Background**

{¶ 3} Appellee and cross-appellant, James Gideon, was licensed as a physician by the State Medical Board of Ohio and maintained a practice in rheumatology. In 2017, three of his patients accused him of inappropriately touching them during office visits. Two investigations were opened: one by the local police and one by an investigator working for the state medical board. Although Gideon told the police that he did not inappropriately touch any patients, the investigator told the police that Gideon admitted to misconduct. The investigator shared that information with the police as the medical board is authorized to do under R.C. 4731.22(F)(5).

{¶ 4} The state charged Gideon with three third-degree misdemeanor counts of sexual imposition in three separate cases that were consolidated for trial. Gideon moved to suppress the statements that he had made to the investigator as having been illegally compelled in violation of the Fifth Amendment to the United States Constitution. He argued that because he believed he was required to submit to the interview by the medical board and answer the investigator's questions or risk losing his medical license, the medical-board investigator coerced his admissions with the threat of losing his medical license. The trial judge denied the

motion to suppress, concluding that Gideon "made voluntary statements during a noncustodial interview." A jury found Gideon guilty in all three cases. The trial court imposed a jail term of 60 days in each case and ordered the sentences to run consecutively to each other.

{¶ 5} On appeal, the Third District Court of Appeals reversed the convictions. The court of appeals determined that the trial court should have granted Gideon's motion to suppress consistent with *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), which held that statements obtained from a public employee under threat of job loss are unconstitutionally coerced and inadmissible in subsequent criminal proceedings. The court noted that Gideon had a statutory duty to answer truthfully all questions posed by the medical-board investigator and that the investigator "created an impression that Gideon's refusal to cooperate with his investigation would result in the type of penalty prohibited under *Garrity*," 2019-Ohio-2482, 130 N.E.3d 357, ¶ 51.

{¶ 6} Both the state and Gideon appealed the appellate court's judgment. The state offers this proposition of law:

> When a non-government employee gives a statement to an administrative board/licensing agency governed by the state, and when there is no threat of loss of employment or removal from office, that statement is not subject to *Garrity v. New Jersey*, 385 U.S. 493 (1967).

{¶ 7} Gideon offers two cross-propositions of law:

> (1) A licensing board investigator's intent to assist law enforcement in obtaining a criminal conviction for the purpose of influencing the outcome of an administrative-sanction proceeding

4

against a licensee is a factor strongly weighing in favor of a finding that the licensee had an objectively reasonable belief that assertion of his Fifth Amendment Privilege Against Self-Incrimination would expose him to revocation of his license and loss of his livelihood.

(2) Under App.R. 12(A)(C), a court of appeals has a duty to adjudicate any assignment of error that raises a claim of insufficiency of the evidence to support a criminal conviction or that involves a claim of error that is likely to again become an issue during proceedings upon remand.

**The Privilege Against Self-Incrimination**

{¶ 8} We will first address the state's proposition of law together with Gideon's first cross-proposition of law. The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." Article I, Section 10 of the Ohio Constitution provides the same protection: "No person shall be compelled, in any criminal case, to be a witness against himself * * *." "The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

{¶ 9} Because a witness may voluntarily testify to matters which may be incriminating, the privilege against self-incrimination is not self-executing. The witness seeking the privilege must "claim it." *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943). If the witness answers a question, the answer will be considered voluntary. *See Minnesota v. Murphy*, 465 U.S. 420, 427,

104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). Gideon did not assert the privilege against self-incrimination during his interview with the medical-board investigator.

{¶ 10} At times, when it is necessary to "safeguard the core constitutional right protected by the Self-incrimination Clause," an assertion of the privilege against self-incrimination is not required. *Chavez v. Martinez*, 538 U.S. 760, 770, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion). An exception to asserting the privilege exists for statements made during custodial interrogations in which the state undermines the privilege by physically or psychologically coercing a suspect. *See Miranda v. Arizona*, 384 U.S. 436, 448-450, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 11} The right to remain silent can also be infringed by coercion when there is a penalty for asserting the right. In *Garrity*, the attorney general investigated police officers for fixing traffic tickets. Although advised of their right to remain silent, the officers also were told that refusing to answer questions would lead to the termination of their employment. The officers answered questions and the state used some of their answers against them in a subsequent criminal case. The U.S. Supreme Court observed that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Garrity*, 385 U.S. at 497, 87 S.Ct. 616, 17 L.Ed.2d 562. The court thus held that the confessions were not voluntary but coerced and that the Fourteenth Amendment prohibited the use of the statements in subsequent criminal proceedings. *Id*. at 497-498, 500.

{¶ 12} Unlike the officers in *Garrity*, Gideon is not a public employee. He was a medical doctor in private practice. As a practicing physician, he was subject to licensure by the state medical board. *See* R.C. 4731.17(B) (state medical board shall issue licenses to practice medicine). Gideon's medical license constitutes a liberty and property interest subject to due-process protections. *Watts v. Burkhart*, 854 F.2d 839, 842 (6th Cir.1988) ("the freedom to pursue a career is a protected

liberty interest, and * * * state regulation of occupations through a licensing process gives rise to protected property interests"); *see also Flynn v. State Med. Bd.*, 2016-Ohio-5903, 62 N.E.3d 212, ¶ 45 (10th Dist.).

{¶ 13} The medical board has disciplinary authority over medical doctors and may "limit, revoke, or suspend a license or certificate to practice or certificate to recommend, refuse to issue a license or certificate, refuse to renew a license or certificate, refuse to reinstate a license or certificate, or reprimand or place on probation the holder of a license or certificate * * *." R.C. 4731.22(B). Among the reasons listed for exercising the authority to impose such sanctions is the "[f]ailure to cooperate in an investigation" and the "failure to answer truthfully a question presented by the board in an investigative interview * * *." R.C. 4731.22(B)(34).

{¶ 14} The state's threat to impose a legal penalty for the failure to give truthful responses in a state-medical-board investigation is coercive. This threat puts a medical doctor in the position of having to choose between two rights: the property right in the medical license or the privilege against self-incrimination. *See Spevack v. Klein*, 385 U.S. 511, 512, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (private-practice lawyer could not be disbarred for refusing to testify at a judicial inquiry into professional misconduct).

{¶ 15} A different approach is required when, as here, the person under investigation has not been "expressly confronted * * * with the inescapable choice of either making an incriminatory statement or being fired," *State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, ¶ 23. When incriminating statements are not coerced by the direct threat of job termination, we apply an "objectively reasonable" "subjective belief" test. *Id.* Under that test, statements are compelled by threat of discharge if (1) a person subjectively believed that asserting the privilege would lead to discharge and (2) that belief was objectively reasonable under the circumstances. *Id.*

{¶ 16} Applying the *Graham* test, the trial court found that while Gideon testified that he *subjectively* believed that he would "be penalized" with the loss of his medical license if he did not answer questions posed by the medical-board investigator, his belief was not *objectively* reasonable.

{¶ 17} In *Graham,* we explained that the objective reasonableness of a defendant's belief that disciplinary action will result unless the defendant cooperates requires a showing of "some demonstrable coercive action by the state beyond '[t]he general directive to cooperate.' " (Brackets sic.) *Graham* at ¶ 23, quoting *United States v. Vangates*, 287 F.3d 1315, 1324 (11th Cir.2002). We further explained that " 'ordinary job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge.' " *Id*., quoting *People v. Sapp*, 934 P.2d 1367, 1372 (Colo.1997).

{¶ 18} Gideon did not establish through evidence that coercive action by the medical-board investigator had occurred. The trial court found no evidence that the medical-board investigator informed Gideon that "he must waive his rights against self-incrimination or subject himself to discharge or revocation of his license." And neither Gideon nor the investigator mentioned during the interview anything that suggested Gideon could lose his medical license if he refused to comply with the investigator's questioning.

{¶ 19} Besides the lack of evidence showing that Gideon had an objectively reasonable basis for believing that he could lose his medical license, the trial court correctly found that R.C. 4731.22(B), which requires a doctor's cooperation in an investigation, does not subject that doctor "to an automatic suspension or revocation" of a license should the doctor exercise the right to remain silent. Although that section speaks in mandatory terms about discipline for certain violations (the board "shall" impose one of the listed sanctions), discipline is not automatic. It requires the affirmative vote of "not fewer than six" medical-board

members to impose discipline for one of the reasons listed in R.C. 4731.22(B). And even when the medical board determines that a doctor has committed a violation, revocation of a medical license is not a required sanction—it is one of several sanctions available to the board. *See* R.C. 4731.22(B). In Gideon's case, there was no direct threat of discipline for failure to cooperate; he faced only the possibility of discipline.

{¶ 20} The Third District disagreed: "the trial court did not capture the concept of [R.C. 4731.22] and, more importantly, failed to consider the *totality* of the circumstances surrounding Gideon's interview * * *." (Emphasis sic.) 2019-Ohio-2482, 130 N.E.3d 357, at ¶ 31.

{¶ 21} Yet the trial court *did* consider the circumstances surrounding the interview. In its findings of fact, the trial court observed that Gideon sounded "eager to speak" with the investigator despite having no notice of the investigator's visit. Gideon declined the investigator's offer to reschedule the interview. Because the interview occurred in Gideon's office, the investigator told Gideon that he would pause the interview so that Gideon could see waiting patients. The trial court found that Gideon "took the lead initially in the interview and described his techniques with his patients prior to any substantive questions being posed by the investigator." Although Gideon testified during the suppression hearing that the surprise nature of the interview denied him the ability to refresh his memory of the specific patients, the trial court determined that Gideon "was able to give a very detailed account of the treatments provided" and that only 18 minutes into the interview, Gideon "admitted to touching certain areas on the patients and succumbing to temptation."

{¶ 22} Appellate review of a suppression ruling involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 158 Ohio

St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 16. "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

{¶ 23} The court of appeals did not dispute the trial court's factual findings. It believed, however, that the investigator acted as a "straw man" for the state. 2019-Ohio-2482, 130 N.E.3d 357, at ¶ 42. While the board may share with law-enforcement agencies any information it receives in an investigation, *see* R.C. 4731.22(F)(5), cooperation with law-enforcement officials does not necessarily convert a medical-board investigation into a law-enforcement mission. *See State v. Jackson*, 154 Ohio St. 3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 21, citing *Ohio v. Clark*, 576 U.S. 237, 249, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). The investigator admitted that he agreed to share information with the police, but that does not mean that he acted for the primary purpose of furthering a criminal prosecution by the state. The investigator interviewed Gideon for the primary purpose of determining whether Gideon was subject to disciplinary action by the medical board for engaging in the misconduct alleged by his patients.

{¶ 24} We conclude that Gideon's medical license is a property right and that the threatened loss of the license is a form of coercion that can compromise the United States Constitution's Fifth Amendment privilege against self-incrimination. That said, in order for coercion to be sufficient to warrant the suppression of statements Gideon made during a medical-board investigative interview, his belief that he would lose his license if he failed to participate in the medical-board interview and answer questions truthfully must be both subjectively believed and objectively reasonable. In this case, based on our independent, de novo review of the facts and circumstances under which the investigator interviewed Gideon, we conclude that Gideon's belief that a refusal to answer truthfully questions posed by the medical-board investigator could lead to the loss of his medical license was not

objectively reasonable.  We find, therefore, that Gideon has failed to satisfy the legal standard established in *Graham.*

### Duty to Adjudicate Assignments of Error

{¶ 25} In his second cross-proposition of law, Gideon claims that the court of appeals erred by finding that his assignment of error relating to the sufficiency of the evidence on one count of sexual imposition was moot.  He argues that the appellate court's remand on the suppression issue did not moot this assignment of error.  We agree.

{¶ 26} App.R. 12(A)(1)(c) states that "[u]nless an assignment of error is made moot by a ruling on another assignment of error," a court of appeals shall "decide each assignment of error and give reasons in writing for its decision."  An assignment of error is moot when it cannot have " 'any practical legal effect upon a then-existing controversy.' "  *Culver v. Warren*, 84 Ohio App. 373, 393, 83 N.E.2d 82 (7th Dist.1948), quoting *Ex parte Steele*, 162 F. 694, 701 (N.D.Ala.1908).  Put differently, an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court.

{¶ 27} An assignment of error going to the sufficiency of the evidence supporting a criminal count is always potentially dispositive of that count.  While a reversal based on weight of the evidence does not preclude a retrial, a reversal based on insufficient evidence leads to an acquittal that bars a retrial.  *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *Tibbs v. Florida*, 457 U.S. 31, 47, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).  "Because 'the state is not entitled to retry a criminal defendant after reversal for trial court error if the state failed in the first instance to present sufficient evidence * * * a defendant's assigned error that the conviction is based on insufficient evidence is not moot under these circumstances.' "  (Ellipsis added in *Mathis.*)  *State v. Mathis*, 6th Dist. Lucas No. L-18-1192, 2020-Ohio-3068, ¶ 78, quoting *State v. Vanni*, 182 Ohio App.3d 505,

2009-Ohio-2295, 913 N.E.2d 985, ¶ 15 (9th Dist.); *see also State v. Croskey*, 8th Dist. Cuyahoga No. 107772, 2019-Ohio-2444, ¶ 9 (errors which could result in an acquittal must be separately addressed).

{¶ 28} In *State v. Brewer*, 113 Ohio St.3d 375, 2007-Ohio-2079, 865 N.E.2d 900, we determined that the court of appeals erred by refusing to consider an assignment of error challenging the sufficiency of the evidence after it had determined trial error warranted reversal of the defendant's conviction. A jury had found Brewer guilty of gross sexual imposition. On direct appeal, he raised nine assignments of error, including that hearsay testimony was improperly allowed by the court and that the state failed to offer sufficient evidence. *State v. Brewer*, 8th Dist. Cuyahoga No. 87701, 2006-Ohio-6029, ¶ 1. The court of appeals determined that the trial court erred by allowing hearsay testimony into evidence and ordered a new trial. *Id*. at ¶ 13. That finding led it to conclude that the remaining assignments of error were moot. *Id*. We summarily reversed that decision: "[t]he judgment of the court of appeals holding that the assignment of error in which appellant challenged the sufficiency of the evidence was moot is reversed, and the cause is remanded to the court of appeals for consideration of that assignment of error." *Brewer*, 113 Ohio St.3d 375, 2007-Ohio-2079, 865 N.E.2d 900, at ¶ 2.

{¶ 29} When a conviction is based on evidence that does not establish a defendant's guilt beyond a reasonable doubt, the court of appeals must vacate the conviction and double-jeopardy protection bars the defendant's retrial for the same offense. An assignment of error raising the sufficiency of the evidence is thus potentially dispositive of a particular count and cannot be moot. When evaluating an assignment of error challenging the sufficiency of the evidence, a reviewing court must consider all evidence admitted at trial, including the improperly admitted evidence that was the source of the reversal for trial error. *See State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 24-26. The court

of appeals erred by finding that Gideon's assignment of error relating to the sufficiency-of-the-evidence claim was moot under App.R. 12(A)(1)(c).

**Conclusion**

{¶ 30} For the reasons stated above, we reverse the judgment of the Third District Court of Appeals. We also remand the cause to that court to consider Gideon's assignment of error relating to the sufficiency of the evidence, and because we reverse its judgment on the motion to suppress, the appellate court will now need to consider Gideon's other assignments of error that were deemed moot.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, and DEWINE, JJ., concur.

DONNELLY, J., dissents, with an opinion.

_____

**DONNELLY, J., dissenting.**

{¶ 31} The majority opinion states that the medical board can " 'limit, revoke, or suspend' " a license to practice medicine if the licensee fails to " 'cooperate in an investigation' " or " 'answer truthfully a question presented by the board in an investigative interview.' " Majority opinion at ¶ 13, quoting R.C. 4731.22(B). The majority opinion concludes that appellee and cross-appellant, James Gideon, subjectively believed that he could lose his license if he failed to cooperate or to answer questions truthfully. I agree. *See* R.C. 4731.22(B)(34). Based on the language of R.C. 4731.22(B), Gideon's subjective belief that he could lose his license was well-founded. But the majority opinion further concludes that Gideon's subjective belief was not objectively reasonable because he did not demonstrate " 'coercive action by the state beyond "[t]he general directive to cooperate." ' " (Brackets sic.) [*State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-

13

2114, 991 N.E.2d 1116,] ¶ 23, quoting *United States v. Vangates*, 287 F.3d 1315, 1324 (11th Cir.2002)." Majority opinion at ¶ 17. I disagree.

**{¶ 32}** The majority concludes that the "investigator interviewed Gideon for the primary purpose of determining whether Gideon was subject to disciplinary action by the medical board for engaging in the misconduct alleged by his patients," majority opinion at ¶ 23. The well-written and unanimous opinion of the court of appeals thoroughly explicates why the majority's characterization of the investigator's interview of Gideon is untenable:

The evidence in the record reflects that the circumstances surrounding the administrative investigation at issue in this case show some demonstrable, coercive action by the state beyond the general directive to cooperate. Indeed, the combination of Gideon's duty to cooperate under R.C. 4731.22(B)(34) and Investigator Yoakam's process in this case exceeded an *ordinary* job pressure to cooperate. As we have noted, R.C. 4731.22(B)(34) requires licensees to cooperate with investigations of the board.[2 (originally fn.8)]

---

2. The following language appears as footnote 8 in the court of appeals' opinion:

It appears that the State contends that R.C. 4731.22(B)(34)'s duty to cooperate requires *only* that a subject answer truthfully questions posed by an investigator of the board during an interview. *Compare United States v. Goodpaster*, 65 F.Supp.3d 1016, 1029 (D.Or.2014) (noting that "[a]n order to 'cooperate' demands more of the reasonable employee than an order merely to be 'truthful' "), citing *Minnesota v. Murphy*, 465 U.S. 420, 434, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (observing that "Murphy's probation condition [to be truthful] proscribed only false statements"). That is, the State argues that "[t]elling falsehoods * * * is different than remaining silent, and the Fifth Amendment is not implicated." (Appellee's Brief at 6). However, the text of that subsection of the statute states that a subject must *cooperate* in investigations of the board. R.C. 4731.22(B)(34) proceeds to provide a non-exhaustive list of ways in which a subject must cooperate with an investigation of the board—only one of which is to provide truthful answers to questions presented by the board in an investigative interview. *See In re Hartman*, 2 Ohio St.3d 154, 155-156, 443 N.E.2d 516 (1983) (noting that the word " 'including' implies that that which follows is a partial, not

14

*Compare* [*United States v. Goodpaster*, 65 F.Supp.3d 1016, 1029 (D.Or.2014)] (noting that "Goodpaster was subject to a regulation * * * requiring that he 'cooperate with all audits, reviews, and investigations conducted by the Office of Inspector General' "), quoting 39 C.F.R. 230.3(a). R.C. 4731.22(B) puts licensees on notice that their failure to cooperate, amongst other reasons, will penalize their license (by a vote of no fewer than six members of the board). *Compare id.* ("The same regulation provides that 'failing to cooperate [* * *] may be grounds for disciplinary or other legal action.' "), quoting 39 C.F.R. 230.3(a).

Further, in addition to R.C. 4731.22(B)(34)'s directive to cooperate with the board's investigation, the record reflects "some demonstrable action of the state" supporting Gideon's subjective belief. *See* [*People v.* ]*Sapp*[, 934 P.2d 1367, 1372 (Colo.1997)]; [*United States v.* ]*Camacho*[, 739 F.Supp 1504, 1518 (S.D.Fla.)]. In this case, the demonstrable action of the State lies with Investigator Yoakam's conduct and his intent underlying that conduct. *Compare Camacho*, 739 F.Supp. at 1518-1519 (construing the evidence in the record reflecting the "actions of the investigators" to determine whether there was "demonstrable state conduct" and, thus, whether the defendants' beliefs that they would penalized for asserting their Fifth Amendment rights were objectively reasonable).

At the suppression hearing, Investigator Yoakam testified to the extent that he collaborated with law enforcement as part of his

---

an exhaustive listing of all that is subsumed within the stated category. 'Including' is a word of expansion rather than one of limitation or restriction.").

(Emphases, brackets, and ellipses sic.)

investigation—that is, he specifically stated that the investigation of Gideon "turned into a joint investigation." (Aug. 22, 2017 Tr. at 4); (Oct. 13, 2017 Tr. at 7, 20-21). Indeed, Sergeant Hochstetler concurred that he and Investigator Yoakam agreed "to cooperate with each other" during the course of their investigations. (Oct. 13, 2017 Tr. at 51-52). By cooperating, Sergeant Hochstetler clarified that meant that he and Investigator Yoakam would share information. Investigator Yoakam elaborated that the Revised Code permits him to share information obtained as part of his investigations with law enforcement and that he will share such information if there is "a shared interest." (*Id.* at 19-20). Investigator Yoakam further testified that he shared the information he collected (regarding Gideon) with the Bluffton Police Department.

Undeniably, R.C. 4731.22(F) provides, in relevant part, the following:

"(3) In investigating a possible violation of this chapter or any rule adopted under this chapter, * * * the board may question witnesses, conduct interviews, administer oaths, order the taking of depositions, inspect and copy any books, accounts, papers, records, or documents, issue subpoenas, and compel the attendance of witnesses and production of books, accounts, papers, records, documents, and testimony, except that a subpoena for patient record information shall not be issued without consultation with the attorney general's office and approval of the secretary and supervising member of the board.

"* * *

"(4) All * * * investigations * * * of the board shall be considered civil actions for the purposes of section 2305.252 of the Revised Code.

"(5) * * *

The board may share any information it receives pursuant to an investigation * * * with law enforcement agencies, other licensing boards, and other governmental agencies that are prosecuting, adjudicating, or investigating alleged violations of statutes or administrative rules."

R.C. 4731.22(F)(3)-(5) (Apr. 6, 2017) (current version at R.C. 4731.22(F)(3)-(5) (Mar. 20, 2019)).[3 (originally fn.9)]

Thus, while there is nothing inherently wrong with Investigator Yoakam and law enforcement's agreement to share information, the evidence in the record reveals that Investigator Yoakam exceeded statutorily permissible collaboration by taking demonstrable steps to coerce Gideon to provide him an incriminating, oral and written statement in reliance on Gideon's duty to cooperate. In other words, Investigator Yoakam was posing

---

3. The following language appears as footnote 9 in the court of appeals' opinion:

R.C. 2305.252 applies to peer-review privilege. *See, e.g.*, *Cousino v. Mercy St. Vincent Med. Ctr.*, 6th Dist. Lucas, 2018-Ohio-1550, 111 N.E.3d 529, ¶ 15 ("The purpose of this statute is to protect the integrity and confidentiality of the peer review process so that health care entities have the freedom to meaningfully review and critique—and thereby improve—the overall quality of the healthcare services they provide."). The statute also applies the peer-review privilege to *only* the Bureau of Workers' Compensation ("BWC"); however, the statute excepts the BWC to "share proceedings and records within the scope of the peer review committee * * * with law enforcement agencies, licensing boards, and other governmental agencies that are prosecuting, adjudicating, or investigating alleged violations of applicable statutes or administrative rules." R.C. 2305.252(B).

(Emphasis and ellipsis sic.)

as a "straw man" to effectuate law enforcement's criminal investigation. *See State v. Gradisher*, 9th Dist. Summit No. 24716, 2009-Ohio-6433, 2009 WL 4647378, ¶ 23 (Belfance, J., dissenting) (approving the "concern that government agents should not pose as 'straw men' in order to effectuate police investigations"). Specifically, Investigator Yoakam contacted Sergeant Hochstetler prior to interviewing Gideon, and "discussed that [he] was going to hold off on the administrative investigation until [law enforcement determined] that [Investigator Yoakam] could interview [Gideon]." (Oct. 13, 2017 Tr. at 7-8). Investigator Yoakam's intention for sharing his investigative plan with law enforcement was to "determine how [law enforcement] was going to proceed with the criminal case" because proving an administrative-sanction case is easier "from a criminal conviction" as opposed to "through witness testimony." (*Id.* at 15-16). That is, he elaborated that his method is "what they call a bootstrap on a criminal case that's where a physician * * * is criminally charged, and the Board takes action on that criminal disposition, and the other [is] based on information gathered in the course of an investigation. Action that's taken based on that." (*Id.* at 15).

Prior to Investigator Yoakam's interview of Gideon, Sergeant Hochstetler told Investigator Yoakam that Gideon "denied any improprieties during [law enforcement's] interview" of Gideon. (Oct. 13, 2017 Tr. at 21, 55). And, after discussing Gideon's denials to law enforcement with Sergeant Hochstetler, Investigator Yoakam informed Sergeant Hochstetler that it would not be "appropriate" for law enforcement to jointly interview Gideon with Investigator

Yoakam. (*Id.* at 28, 55-56). Specifically, Investigator Yoakam testified that

"doctor's [sic] are obligated to cooperate in our investigation. So [he] did not want that to * * * impede in * * * any of the criminal proceedings...And [he] didn't want * * * there to be an issue that the doctor provided a statement with law enforcement present because the provider is *obligated to cooperate in our investigations.*"

(Emphasis added.) (*Id.* at 29). (*See also* Oct. 13, 2017 Tr. at 55); (Defendant's Ex. 4). In other words, Investigator Yoakam's method was to avoid a scenario in which his interview (of Gideon) could not be used as part of the criminal case because (as indicated by Investigator Yoakam) the lack of a criminal conviction would make his administrative-sanction case more cumbersome. *Compare Gradisher* at ¶ 23 (Belfance, J., dissenting) (expressing concern that "government overreaching could easily occur by pushing off criminal investigations to state agents so as to bypass protection against the abridgement of an individual's Fifth Amendment rights"); *Camacho*, 739 F.Supp. at 1519 (noting that the investigator's action in purposely omitting "his preamble regarding voluntariness and compulsion * * * in order to avoid flagging the issue of voluntariness" "speaks louder" than any belief that the statements were voluntary and concluding that "the investigators' central aim was to take a statement first and litigate its admissibility later").

Moreover, based on our review of the record, Investigator Yoakam's intent for the investigation reflects the demonstrable state action necessary to support Gideon's subjective belief that his medical license would be penalized if he failed to cooperate with

Investigator Yoakam's investigation. Specifically, Investigator Yoakam's interview of Gideon reflects his intent to assist law enforcement in obtaining a criminal conviction of Gideon for purposes of influencing the outcome the administrative-sanction case against Gideon.

Even though he is not a law enforcement officer, Investigator Yoakam testified that he had law enforcement training and is familiar with the elements of offenses under the Revised Code, including sexual imposition. Keeping his training in mind, Investigator Yoakam arrived unannounced to Gideon's medical office to conduct his interview to catch him "off guard" "to get the truth out of [him]." (Oct. 13, 2017 Tr. at 5, 32-33). Despite Gideon having patient appointments at the time of the visit, Investigator Yoakam did not advise Gideon that he did not have to speak with him that day or otherwise offer to reschedule—he merely asked Gideon "if he would have a few minutes to chat with" him. (*Id.* at 5). (*See also* State's Ex. A). In other words, Investigator Yoakam did nothing to dissuade Gideon's belief that he was statutorily obligated to cooperate with his investigation, which included consenting to Investigator Yoakam's request to "chat." *Compare Camacho* at 1511 ("At no time during the interview or after did either Sergeant Green or Assistant State Attorney DiGregory make any effort to dissuade Sinclair of his view that he was compelled to give a statement or answer his question.").

(Emphases and ellipses sic; brackets added in citations and footnote numbers; remaining brackets sic.) 2019-Ohio-2482, 130 N.E.3d 357, at ¶ 38-45.

20

{¶ 33} This analysis amply supports a conclusion that Yoakam's investigation was improperly coercive under *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Although there is nothing wrong with Yoakam and the Bluffton Police Department sharing information, their approach suggests that Yoakam was strategically attempting to elicit information to benefit the Bluffton Police Department investigation. This is tantamount to collaborating—not merely sharing information that was collected independently. If Yoakam had appeared at Gideon's office with an officer from the Bluffton Police Department, the coercive nature of the investigation would have been manifest. It is no less so here. Yoakam was all but deputized to act for the benefit of the Bluffton Police Department. Moreover, the court of appeals examined another way in which the interview demonstrates that Gideon had an objectively reasonable belief that his medical license was at risk if he did not cooperate:

> Investigator Yoakam advised Gideon at multiple points to "to go back to [law enforcement] and change his statement" to avoid facing possible falsification charges. (Oct. 13, 2017 Tr. at 22). Investigator Yoakam's insistence that Gideon return to law enforcement to change his statement is also evidence supporting Gideon's belief that a refusal to give a statement will be met with a licensure penalty. That is, Investigator Yoakam's insistence that Gideon provide law enforcement with a statement reflects an intent to coerce Gideon to cooperate with the investigation. Indeed, (as raised during cross-examination) if Investigator Yoakam was "just concerned about [the] medical investigation there would be no need to tell [Gideon] to go back to the police department and change his statement * * *." (*Id.* at 22).

(Brackets and ellipsis sic.) 2019-Ohio-2482, 130 N.E.3d 357, at ¶ 48.

{¶ 34} The court of appeals also had appropriate concern that Yoakam's conduct after the interview reflects his understanding that he and the Bluffton Police were engaged in a joint investigation, not a mere sharing of information:

> At the conclusion of the interview, instead of reporting back to the board, Investigator Yoakam immediately went to the Bluffton Police Department to report Gideon's confessions to law enforcement. (*See* Defendant's Ex. 2). Despite his employment responsibilities with the State Medical Board, Investigator Yoakam chose to *immediately share* Gideon's confessions with law enforcement "because the doctor had [ ] an interview with [law enforcement] where he denied any impropriety so [he] wanted to tell [law enforcement] what happened during [his] interview." (Oct. 13, 2017 Tr. at 26-27). Moreover, Investigator Yoakam agreed that he "wanted to assist [law enforcement] in that criminal investigation by providing [law enforcement] with statements made by Dr. Gideon during an interview that same day * * *[.]" (*Id.* at 27).

(Emphasis, brackets, and ellipsis sic.) 2019-Ohio-2482, 130 N.E.3d 357, at ¶ 50.

{¶ 35} I agree with the court of appeals' conclusion that

> based on the facts and circumstances presented by this case, Investigator Yoakam's actions created an impression that Gideon's refusal to cooperate with his investigation would result in the type of penalty prohibited under *Garrity*. *See Camacho* at 1520 (concluding "that the actions of the State were directly implicated in creating [the] belief" that the defendants' subjective belief "that

22

failure to answer would result in termination"). Therefore, Gideon's belief that his medical license would be penalized if he did not cooperate with Investigator Yoakam's investigation was objectively reasonable. *See id.* Thus, Gideon's statements were not voluntary within the meaning of *Garrity*. *Accord Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, at ¶ 30 ("Statements extracted under these circumstances cannot be considered voluntary within the meaning of *Garrity*.")

2019-Ohio-2482, 130 N.E.3d 357, at ¶ 51.

{¶ 36} The circumstances of Yoakum's interview demonstrate that it was coercive and therefore that Gideon's subjective belief that he could lose his medical license if he did not answer was objectively reasonable. Accordingly, I conclude that the trial court erred when it denied Gideon's motion to suppress statements he made to Yoakam. I would affirm the well-reasoned decision of the court of appeals. I dissent.

_____

Nicole M. Smith, Lima Assistant City Prosecuting Attorney, and Anthony M. DiPietro, Deputy Law Director, for appellant and cross-appellee.

Dennis C. Belli, for appellee and cross-appellant.

_____