[Cite as *State v. Kirchgessner*, 2021-Ohio-4542.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO/CITY OF HAMILTON, | : | |
| Appellee, | : | CASE NO. CA2021-05-050 |
| | : | O P I N I O N |
| - vs - | | 12/27/2021 |
| | : | |
| JEFFERY M. KIRCHGESSNER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM HAMILTON MUNICIPAL COURT
Case No. 20CRB03123

Laura Gibson, City of Hamilton Prosecuting Attorney, for appellee.

Lorraine M. Search, for appellant.

**S. POWELL, J.**

{¶ 1}  Appellant, Jeffery M. Kirchgessner, appeals his conviction in the Hamilton Municipal Court after a jury found him guilty of fourth-degree misdemeanor attempted sexual imposition.  For the reasons outlined below, we affirm Kirchgessner's conviction.

{¶ 2}  On April 10, 2018, a complaint was filed charging Kirchgessner with attempted sexual imposition in violation of R.C. 2923.02(A) and 2907.06(A)(4), a fourth-degree

misdemeanor in accordance with R.C. 2923.02(E). As stated in the complaint, the charge arose after it was alleged Kirchgessner, who at that time was 26 years old, solicited the victim, C.W., a then 14-year-old female, to "engage in sexual contact with him by having her masturbate him." The record indicates that Kirchgessner, who was at that time the boyfriend of C.W.'s mother, E.W., made this solicitation attempt on the evening of December 13, 2017 while at E.W.'s home located in Hamilton, Butler County, Ohio.

{¶ 3} On April 12, 2021, a one-day jury trial was held on the matter. During trial, the jury heard testimony from three witnesses: the victim, C.W., the victim's mother, E.W., and Detective Mark Nichols with the Hamilton Police Department. Kirchgessner did not offer any witnesses, nor did Kirchgessner himself testify in his defense. The following is a summary of the testimony elicited from C.W., E.W., and Detective Nichols.

*C.W.'s Trial Testimony*

{¶ 4} C.W. testified that shortly after E.W. left for work on the evening of December 13, 2017 that she and Kirchgessner were "hanging out," sitting on E.W.'s bed; Kirchgessner was on his cellphone scrolling through Facebook while she watched YouTube videos on the television. C.W. testified that Kirchgessner, who the record indicates C.W. referred to as her stepfather, then started showing her "inappropriate," sexually suggestive memes and GIFs on his cellphone. C.W. testified that this included one GIF where a woman "had like a very tight like shirt on, kind of like a chest plate of armor, and she * * * pushed her shoulders back and the shirt busted, and it was a cut scene to like an explosion." C.W. testified that Kirchgessner showing her this GIF made her feel "uncomfortable," that Kirchgessner's behavior was unusual, and that this was not how she and Kirchgessner typically interacted.

{¶ 5} C.W. testified that after Kirchgessner showed her this GIF that Kirchgessner put his cellphone down, put his hand on her thigh, "squeezed it just a little bit," and asked

- 2 -

her if she "had any boundaries." C.W. testified that she responded to Kirchgessner and said, "what do you mean." C.W. testified that Kirchgessner then asked her if "touching" was "crossing a boundary." Still not sure what Kirchgessner was asking, C.W. testified that Kirchgessner then asked her if she would "be willing to do something that would end with [him] getting off." C.W. testified that she then "knew exactly what was happening" and took this to mean Kirchgessner was asking her to "[g]ive him a hand job." C.W. testified that she came to this conclusion because of the "inappropriate," sexually suggestive memes and GIFs that Kirchgessner had been showing her on his cellphone, as well as "that feeling in your gut."

{¶ 6} Continuing, C.W. testified that Kirchgessner's request to masturbate him made her feel "so uncomfortable" that she became "frozen" with her eyes locked, staring at the door. C.W. testified that she then responded to Kirchgessner's request and said, "yes," that "would cross a boundary" and that she "was not okay with that." C.W. then testified that she "could not look [Kirchgessner] in the eyes" because she "felt like [she] was going to throw up or pass out." C.W. also testified that Kirchgessner was not laughing when he asked her to masturbate him, nor was Kirchgessner doing anything to make her think he was joking about having her masturbate him. C.W. testified that she came to this conclusion because Kirchgessner was at that time "gently" rubbing her thigh and exhibiting a noticeable erection.

{¶ 7} C.W. testified that Kirchgessner then "pulled his hand away" from her thigh, but "dragged his fingertips across [her] thigh again." C.W. testified that Kirchgessner then told her that was "fine," but that she could not tell her mother, E.W. C.W. testified that Kirchgessner then "literally bribed" her and told her that if she promised not to tell E.W. that she could use her electronic tablet while her mother was at work and that he would drive her to get food from her favorite restaurant. C.W. testified that during the drive Kirchgessner

touched her thigh again, but that "[i]t didn't stay there long because the car was a stick shift and he had to switch gears[.]" C.W. testified that Kirchgessner also let her use her electronic tablet for a few hours before she went to bed. As C.W. testified, "I was given my tablet and I ate my food. I ate at the kitchen table. I did not want to be around him. And then after I had eaten, I went to bed."

{¶ 8} C.W. testified that early the next morning she got up from bed and logged onto her computer where she contacted her long-distance boyfriend. C.W. testified that during this conversation she told her boyfriend "[e]verything about what had happened the previous night" between her and Kirchgessner. C.W. testified that she also asked her boyfriend to tell her mother, E.W., to break the news about Kirchgessner so that she would not have to do it herself. C.W. testified she did this because "obviously something was going to happen" between E.W. and Kirchgessner and that she "felt like that was [her] fault," that she was "going to be responsible for that." Asked to explain why she felt like whatever happened between E.W. and Kirchgessner was going to be her fault, C.W. testified, "I knew that they weren't going to stay together. I knew they were going to break up. And I – and I didn't want to put my mom through that."

{¶ 9} C.W. testified that approximately 10 to 15 minutes after her boyfriend messaged her mother that E.W. came home from work. C.W. testified that E.W. then asked if the allegations against Kirchgessner were true. C.W. testified that she then started crying and told her mother, "yes, that did happen." C.W. testified that she then told E.W. "everything that happened [herself]." C.W. testified that shortly thereafter she, E.W., and Kirchgessner were all "in the same room, because we were – my mom was trying to figure out what to do." C.W. testified that during this time she remembered feeling "very, very, very uncomfortable." C.W. also testified that she "couldn't look at [Kirchgessner]," that she had a "really bad feeling in [her] stomach," and that "[i]t was very uneasy." C.W. also

testified that she remembered E.W. asking Kirchgessner why he did it, a question to which Kirchgessner responded and "never, ever really gave a good answer, other than drugs." C.W. further testified that Kirchgessner later apologized, but that she "didn't feel like he meant it."

*E.W.'s Trial Testimony*

{¶ 10} E.W. testified that she received a message from C.W.'s boyfriend on the morning of December 14, 2017. E.W. testified that after receiving this message that she spoke with C.W. and asked C.W. what happened between her and Kirchgessner the night before, on December 13, 2017. E.W. testified that C.W. responded and "went into detail and told [her] everything that happened." Specifically, E.W. testified that C.W. told her Kirchgessner had "tried to get her to touch his genitals" and asked her "if her touching his genitals would be something that would cross a boundary for her." E.W. testified that C.W. was "upset" during their "brief conversation." E.W. testified that after speaking with C.W. that she then confronted Kirchgessner and asked him if what C.W. had told her was true. E.W. testified that Kirchgessner responded that, yes, "it was the truth." E.W. testified that Kirchgessner later told her that the reason why he tried to get C.W. to touch his genitals was because he was not thinking clearly given the fact that he had been awake for several days using methamphetamine.

*Detective Nichols' Trial Testimony*

{¶ 11} Detective Nichols testified that he investigated the allegations C.W. made against Kirchgessner after he received a referral from childrens' protective services "that he had attempted to get her to masturbate him." Detective Nichols testified that part of this investigation included conducting an interview of Kirchgessner. Detective Nichols testified that during this interview Kirchgessner "denied the allegations" that C.W. had levied against him. Detective Nichols testified that Kirchgessner did acknowledge, however, that "he had

been on a bender" and did not "recall too much of the events" that occurred around that time.

{¶ 12} After both parties rested, and following deliberations, the jury returned a verdict finding Kirchgessner guilty as charged. Four days later, on April 16, 2021, the trial court held a sentencing hearing and sentenced Kirchgessner to 30 days in jail. The trial court also ordered Kirchgessner to pay a $200 fine plus court costs and classified Kirchgessner as a Tier I sex offender who was required to register as a sex offender every year for a period of 15 years. Kirchgessner now appeals his conviction, raising two assignments of error for review.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 15} In his first assignment of error, Kirchgessner argues his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

{¶ 16} Whether the evidence presented was legally sufficient to sustain a verdict is a question of law. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). "When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Tenbrook*, 12th Dist. Butler No. CA2020-01-005, 2020-Ohio-5227, ¶ 9, citing *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. "The relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Moore*, 12th Dist. Fayette No. CA2020-09-016, 2021-Ohio-

1856, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33. "[A] reversal based on insufficient evidence leads to an acquittal that bars a retrial." *State v. Gideon*, Slip Opinion No. 2020-Ohio-6961, ¶ 27.

{¶ 17} Unlike a challenge to the sufficiency of the evidence, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34. "To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34, citing *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. But, even then, the determination of witness credibility is primarily for the trier of fact to decide. *State v. Baker*, 12th Dist. Butler No. CA2019-08-146, 2020-Ohio-2882, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This court, therefore, "will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 10, citing *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶ 18} As noted above, Kirchgessner was convicted of attempted sexual imposition in violation of R.C. 2923.02(A) and 2907.06(A)(4), a fourth-degree misdemeanor in accordance with R.C. 2923.02(E). Pursuant to 2923.02(A), the statute that defines criminal attempt:

> No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

That is to say, "[a]n attempt occurs when a person engages in conduct that, if successful, would constitute or result in the offense and that offense required a culpable mental state of either purposely or knowingly." *State v. Clowers*, 12th Dist. Clermont No. CA2019-01-009, 2019-Ohio-4629, ¶ 20.

{¶ 19} "[A] criminal attempt is complete when a defendant's acts constitute a substantial step in a sequence of events designed to result in the perpetration of a crime." *State v Whitt*, 12th Dist. Warren Nos. CA2017-05-061 and CA2017-05-065, 2018-Ohio-1257, ¶ 16, citing *State v. Clements*, 12th Dist. Butler No. CA2009-11-277, 2010-Ohio-4801, ¶ 20. This requires the state to prove the offender took a "substantial step" in perpetrating the crime. *State v. Curtis*, 12th Dist. Butler No. CA2008-01-008, 2009-Ohio-192, ¶ 16. A "substantial step," as defined by the Ohio Supreme Court, involves conduct that is "'strongly corroborative of the actor's criminal purpose.'" *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 95 quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus, judgment vacated on other grounds, 438 U.S. 910, 98 S.Ct. 3133 (1978). Therefore, in accordance with R.C. 2923.02(A), "a person can be convicted of attempting to commit an offense when they engage in conduct toward the commission of the offense." *State v. Disney*, 12th Dist. Butler No. CA2015-09-171, 2016-Ohio-3545, ¶ 15.

{¶ 20} Pursuant to R.C. 2907.06(A)(4), the statute that defines sexual imposition:

No person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person.

To that end, "[i]f a person has sexual contact with another, who is not the spouse of the offender, and the other person is 13-years-old or older but less than 16-years-old, and the offender is at least 18-years-old and four or more years older than the other person, then that person is guilty of sexual imposition." *State v. Haskell*, 3d Dist. Wyandot No. 16-15-03, 2015-Ohio-3095, ¶ 38. The statute, therefore, "generally prohibits adults from having 'sexual contact' with minors between thirteen and sixteen years of age." *State v. Sanchez-Garza*, 12th Dist. Butler No. CA2016-02-036, 2017-Ohio-1234, ¶ 22.

{¶ 21} R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." "There is no requirement that there be direct testimony regarding sexual arousal or gratification." *Hamilton v. Combs*, 12th Dist. Butler No. CA2018-02-026, 2019-Ohio-190, ¶ 30, citing *State v. Gesell,* 12th Dist. Butler No. CA2005-08-367, 2006-Ohio-3621, ¶ 25. Whether the touching was performed for the purpose of sexual arousal or gratification is instead "a question of fact to be inferred from the type, nature, and circumstances of the contact." *State v. Carnes*, 12th Dist. Brown No. CA2005-01-001, 2006-Ohio-2134, ¶ 41, citing *In re Anderson*, 116 Ohio App.3d 441, 443-444 (12th Dist.1996). This is in addition to the "personality of the defendant." *In re Anderson* at 444. Therefore, in the absence of direct testimony regarding sexual arousal or gratification, "the trier of fact may infer that a defendant was motivated by a desire for sexual arousal or gratification from the totality of the circumstances." *State v. Edwards*, 8th Dist. Cuyahoga No. 81351, 2003-Ohio-998, ¶

- 9 -

**{¶ 22}** To support this assignment of error, Kirchgessner argues the state failed to provide any evidence that he attempted to have sexual contact with the victim, C.W., that was for the purpose of sexually arousing or gratifying to himself. The evidence, however, indicates that on the night in question, December 13, 2017, Kirchgessner was sitting in E.W.'s bed next to C.W., who was then 14 years old, showing her "inappropriate," sexually suggestive memes and GIFs that he had found on Facebook. The evidence indicates that Kirchgessner then asked C.W. if she "had any boundaries," whether "touching" was "crossing a boundary," and if she would be willing "to do something that would end up with [him] getting off." The evidence indicates Kirchgessner asked these questions while he was "gently" rubbing C.W.'s thigh and exhibiting a noticeable erection. This is in addition to the evidence indicating Kirchgessner readily admitted that C.W.'s allegations were true when confronted by C.W.'s mother, E.W., on the morning of December 14, 2017.

**{¶ 23}** Given this evidence, not only do we find the evidence sufficient to support Kirchgessner's conviction, but we also find the evidence to be overwhelming when viewed in a light most favorable to the state. That Kirchgessner never explicitly asked C.W. to touch his genitals, or forced C.W. to touch his genitals, is immaterial. This is because Kirchgessner was convicted of *attempted* sexual imposition, a crime that requires the state to prove only that Kirchgessner's acts constituted a substantial step in a sequence of events designed to result in the perpetration of the underlying sexual imposition offense, rather than the crime of sexual imposition itself. Therefore, given the overwhelming evidence to support Kirchgessner's conviction, Kirchgessner's conviction for attempted sexual imposition was both supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, finding no merit to any of the arguments raised by Kirchgessner herein, Kirchgessner's first assignment of error lacks merit and is overruled.

{¶ 24} Assignment of Error No. 2:

{¶ 25} THE TRIAL COURT'S DECISION TO REQUIRE APPELLANT TO REGISTER AS A TIER I SEXUAL OFFENDER DERIES (sic) THE PURPOSES AND PRINCIPLES OF SENTENCING.

{¶ 26} In his second assignment of error, Kirchgessner argues the trial court erred by classifying him as a Tier I sex offender who was required to register as a sex offender every year for a period of 15 years. To support this argument, Kirchgessner claims the trial court's decision to classify him as a Tier I sex offender runs afoul of the overriding purposes of misdemeanor sentencing set forth in R.C. 2929.22. Kirchgessner also claims the trial court's decision to classify him as a Tier I sex offender seems overly "harsh and excessive" when considering he was found guilty of an offense that carries a maximum possible sentence of not more than 30 days in jail. We disagree.

{¶ 27} The term "sex offender" is defined by R.C. 2950.01(B)(1) to mean a person who is convicted of "any sexually oriented offense." A "Tier I sex offender" is defined by R.C. 2950.01(E)(1)(a) and (E)(1)(h) to include any "sex offender" who is convicted of the crime of attempted sexual imposition, a "sexually oriented offense" as defined by R.C. 2950.01(A)(1) and (A)(14). A person who is a "Tier I sex offender" is required by R.C. 2950.07(B)(3) to register as a "sex offender" every year for a period of 15 years.

{¶ 28} Given these statutes, the trial court was required to classify Kirchgessner as a Tier I sex offender given the jury's verdict finding him guilty of attempted sexual imposition. This holds true despite the fact that the offense for which Kirchgessner was convicted, attempted sexual imposition, carries a maximum possible sentence of not more than 30 days in jail. Therefore, because the trial court did not err by classifying Kirchgessner as a Tier I sex offender who was required to register as a sex offender every year for a period of 15 years, Kirchgessner's second assignment of error lacks merit and is overruled.

{¶ **29**}  Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.