NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0568n.06

No. 25-3264

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 08, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| JAMES A. GIDEON, | ) | |
| Petitioner-Appellant, | ) ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| MATTHEW B. TREGLIA, | ) ) | OPINION |
| Respondent-Appellee. | ) | |

Before: SILER, KETHLEDGE, and MATHIS, Circuit Judges.

KETHLEDGE, Circuit Judge. James A. Gideon appeals the district court's denial of his petition for a writ of habeas corpus. We reject his arguments and affirm.

I.

From 2013 to 2017, Gideon worked as a licensed rheumatologist in Bluffton, Ohio. In 2017, three patients accused him of touching them inappropriately. The accusations prompted a criminal investigation by the local police department and an administrative one by the State Medical Board of Ohio.

In the criminal investigation, a police sergeant questioned Gideon about the accusations, and he denied them. Meanwhile, Chad Yoakam led the administrative investigation. Before interviewing Gideon, Yoakam met with the police sergeant and they agreed to share information about the case. Yoakam told the sergeant that Gideon had a statutory duty to cooperate with the medical board's investigation; Yoakam also advised the sergeant not to attend the interview, so that any admissions could be used in a criminal prosecution.

Yoakam later appeared unannounced at Gideon's office and asked to speak with him. Gideon was busy with patients, and Yoakam offered to reschedule the interview; but Gideon declined the offer and agreed to talk with him. Yoakam recorded their conversation without Gideon's knowledge. Gideon initially took the lead, and explained why his treatment of patients involved the use of therapeutic massage. Eighteen minutes into the conversation, however, Gideon admitted that he had "succumb[ed] to temptation" and touched his patients inappropriately. *State v. Gideon*, 176 N.E.3d 720, 727 (Ohio 2020). Afterward, Yoakam told the sergeant that Gideon had admitted to misconduct. Gideon was later charged with several counts of misdemeanor sexual imposition under Ohio law.

In the criminal case that followed, Gideon moved to suppress his statements to Yoakam, arguing that they were compelled in violation of his Fifth Amendment privilege against self-incrimination. Specifically, Gideon alleged that he had spoken to Yoakam only because, Gideon believed, he would have lost his medical license had he refused. The trial court held an evidentiary hearing, during which Gideon, Yoakam, and the police sergeant (among others) testified; the court also admitted as evidence the audio recording of the interview. The court later denied the motion, holding that Gideon's statements to Yoakam were not made under duress. The case proceeded to trial, where a jury convicted Gideon on three counts. The trial court sentenced him to 180 days in jail.

Although the state court of appeals reversed on the suppression issue, the Ohio Supreme Court disagreed and affirmed Gideon's convictions. The United States Supreme Court denied certiorari. Gideon later sought habeas relief in federal court, which the district court denied. This appeal followed.

II.

To obtain habeas relief, Gideon must show that the Ohio Supreme Court unreasonably applied United States Supreme Court precedent, or based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," when it affirmed the trial court's decision. 28 U.S.C. § 2254(d). An unreasonable application of Supreme Court precedent, for purposes of the habeas statute, is one with which no fairminded jurist would agree. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Here, the relevant precedents are *Garrity v. New Jersey*, 385 U.S. 493 (1967), and *Minnesota v. Murphy*, 465 U.S. 420 (1984)—which, in Gideon's view, the Ohio Supreme Court applied unreasonably when it held that his statements to Yoakam were not coerced.

The Fifth Amendment, applicable to the states through the Fourteenth Amendment, guarantees that no person "shall be compelled in any criminal case to be a witness against himself." *Griffin v. California*, 380 U.S. 609, 615 (1965). In *Garrity*, as part of a police internal-affairs investigation, several officers were expressly warned that, if any of them "refused to answer" an investigator's questions—on the ground that an answer "would tend to incriminate" the officer— then the officer "would be subject to removal from office." 385 U.S. at 494. The officers then made self-incriminating statements. The Supreme Court held that the "choice imposed" on the officers had been "one between self-incrimination or job forfeiture." *Id*. at 496. Thus, the Court held, the statements had been "coerced[.]" *Id.* at 500.

In *Murphy*, when confronted by his probation officer, Murphy had admitted that he had raped and murdered a teenage girl several years before. He was later charged and convicted of those crimes. On appeal, Murphy made an argument like the one Gideon makes here: that he had a duty to meet with his probation officer and answer her questions truthfully; that if he refused, his

probation could be revoked; that his probation officer had "consciously sought incriminating evidence"; and that his statement was therefore coerced. 465 U.S. at 431. But the Supreme Court rejected that argument, for several reasons. For one thing—unlike the officers in *Garrity*—Murphy had not been expressly threatened with punishment if he invoked his privilege against incrimination. *Id.* at 438. For another, if Murphy had thought "his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable." *Id.* Specifically, the relevant Minnesota statute made clear that "revocation [was] not automatic" if he violated a condition of his probation; and he would "be afforded a hearing" before his probation could be revoked. *Id.* Moreover, the Court was unaware of "any case in which Minnesota has attempted to revoke probation" on the ground that a probationer had invoked his right against self-incrimination. *Id.* at 439. Thus, the Court held, Murphy had not been "deterred from claiming the privilege by a reasonably perceived threat of revocation." *Id.*

The Ohio Supreme Court substantially tracked that same reasoning here. True, Gideon had a duty to cooperate in the state medical board's investigation; and true, revocation of Gideon's license was one of many possible sanctions if he refused to cooperate. *Gideon*, 176 N.E.3d at 725. But the facts in *Murphy* were materially no different in those respects. Moreover, Gideon had "not been expressly confronted with the inescapable choice of either making an incriminatory statement or being fired." *Id.* at 726 (cleaned up). In addition, under the applicable Ohio statute, "discipline is not automatic" for a doctor's failure to cooperate with an investigation; and even in the event of discipline, revocation was only "one of several sanctions available to the board." *Id.* Thus, the Ohio Supreme Court held that "Gideon's belief" that he would lose his license, if he invoked his Fifth Amendment privilege in response to Yoakam's questions, "was not objectively reasonable." *Id.* at 727-28.

Analogues to all those same facts were present in *Murphy*. Thus, a fairminded jurist could apply *Murphy* just as the Ohio Supreme Court did here. Gideon counters that the Ohio court denied relief solely on the ground that Gideon had not been threatened expressly with the loss of his license, which in his view would be an unreasonable application of *Murphy*. But that simply misreads the Ohio court's opinion, which explains (as recited above) why his alleged perception of even an implicit threat "was not objectively reasonable." *Id.* at 728. Gideon has identified nothing unreasonable about the Ohio Supreme Court's decision that warrants federal habeas relief.

The district court's judgment is affirmed.