[Cite as *State v. Jones*, 2025-Ohio-2958.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                            Court of Appeals No. E-24-009

    Appellee                                     Trial Court No. 2023CR0079

v.

Antonio Jones                                      **DECISION AND JUDGMENT**

    Appellant                                    Decided:  August 19, 2025

* * * * *

Michael H. Stahl for appellant.

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Antonio Jones, appeals the January 2, 2024 judgments of the Erie County Court of Common Pleas sentencing him to 36 months in prison.  For the reasons that follow, the trial court's judgments are affirmed.

## I. Background and Facts

{¶ 2} Jones was initially indicted on one count each of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony, and assault in violation of R.C. 2903.13(A), a first-degree misdemeanor. Later, the state filed a supplemental indictment charging Jones with one count of intimidation of a victim in violation of R.C. 2921.04(B)(1), a third-degree felony.

{¶ 3} All charges against Jones were tried to a jury. The state presented the testimony of the victim, M.M.; Sandusky Police Department sergeant Tony Dillinger and officer Jose Diaz; the trial court's criminal case manager, Erin Nickles; Erie County Adult Probation officer, Michael Frank; and Erie County Sheriff's deputy Chad Henderson.

{¶ 4} M.M., the victim, testified that she and Jones met in May 2017 and were in a romantic relationship until May 2018, when M.M. ended the relationship. She described their relationship after they broke up as very mentally and emotionally abusive and said that she was afraid of Jones. Jones had never lived with M.M., but after they broke up, he would sometimes show up unannounced and go into her house without permission. In December 2019, Jones took a key to M.M.'s house without her permission.

{¶ 5} In January 2022, Jones, who lived in Mississippi at the time, was visiting Ohio. While he was here, M.M. rented him a car. She explained that he would come to her house when he was in Ohio and "insist on [her] renting a vehicle" for him to use while he was in town. She said that "[h]e would often stand over [her] to rent it on [her]

2.

phone and then he would drive [her] to get the vehicle. It was either rent him a vehicle or he would be driving [her] car." Jones drove the rental car for two days. On the third day, January 22, he went to M.M.'s house to get her car. She allowed him to take her car "because of the fear."

{¶ 6} Jones drove her car to Fremont. M.M. was also in Fremont that evening. She could not get in contact with Jones, so she used an app on her phone to locate her car. When she saw that it was at a local bar, she went to the bar and found Jones there. She told him that she was going to take her car back because he had been drinking and she did not want him driving her car while he was drunk. After M.M. told Jones her plans, he "insisted on coming with [her]." Before getting into M.M.'s car, the two of them had an altercation in the parking lot, during which Jones grabbed M.M.'s arm. M.M. drove them back to her home in Sandusky.

{¶ 7} When they got to M.M.'s house, she went inside. When Jones did not come in, M.M. went back out to the car. While she was there, she saw a text message on Jones's phone, discussing her, that said something about "bringing that bitch in" to the bar. M.M. confronted Jones about the text message and told him that he "had to leave [her] alone and that he would have to be leaving." Although M.M. did not consider herself to be in a relationship with Jones, she confronted him about the text message because she could not understand why he was bothering her and would not leave her alone while also talking to other women.

3.

{¶ 8} Based on her previous experiences with him, M.M. thought that Jones was going to "come at" her and hit her after she told him to leave, so she left the car and ran into the house. She was able to close and lock her screen door, but before she could close the main door, Jones pulled open the screen door and chased M.M. through the house. She believed that Jones intended to "attack" and hit her.

{¶ 9} Eventually, M.M. was able to get out of the house and run to her car. As she tried to open the car door, Jones grabbed her hair and pulled out a handful of her fused hair extensions, which were attached to the root of her natural hair. After grabbing her hair, Jones got into the car with her where he wrapped an arm around her neck and was "choking" her. While this was happening, M.M. was "screaming and fighting." During the struggle, Jones accidentally hit the OnStar button in the car. Someone from OnStar asked if there was an emergency, and M.M. told them that she needed help. When Jones heard the voice of the OnStar operator, he got out of the car. M.M. was then able to close the doors, lock the car, and call 911.

{¶ 10} The 911 call that the state played for the jury begins with M.M. crying and yelling "help me" as the operator tries to get her attention. When M.M. finally responds to the operator, she tells the operator that she is in her car and needs the police because "he attacked [her]." She reports that Jones is the person who assaulted her, he is in her house, he does not have any weapons, and she is locked in her car. She also tells the operator that Jones has around $17,000 of her money. Near the end of the call, she reports that "the officers got him." M.M. is crying and sounds upset throughout the call.

4.

{¶ 11} The photographs of M.M.'s from that night that the state submitted as exhibits show several bruises on her upper left arm, blood under her nose, redness around her neck, and a handful of hair that she was holding. She testified that the bruises on her arm came from Jones grabbing her while they were at the bar, the bloody nose happened during their fight in the car, the redness around her neck came from Jones choking her, and the hair was what Jones pulled from her head, leaving her with a bald spot.

{¶ 12} Jones was arrested after this incident.

{¶ 13} In February 2023, Jones, who was living in Georgia at the time, called M.M. to ask if he could come to Ohio to apologize to her. At the time, Jones was not allowed to have contact with M.M. because of the January 2022 incident. The night before his arraignment, Jones came to M.M.'s house and "told [her] that [she] needed to go to the Prosecutor's Office [and] write an affidavit so the charges could be dropped against him." Although M.M. testified that Jones was not staying with her, he stayed overnight at her house that night. He left the next morning, but when he later returned, "he, again, told [her] that [she] needed to sign an affidavit, not to press the charges, let the Prosecutor's Office know that we were going to be getting married so [she] would not have to testify against him and the charges could be dropped." In response, M.M. explained to him that she "had nothing to do with the charges and that he needed to get an attorney." Jones replied that she "needed to make the affidavit." M.M. thought that Jones would "get very upset with" her and "would be mad again" if she did not contact

5.

the prosecutor. She believed that Jones would hurt her, throw her against the wall, and choke her if she did not do what he asked.

{¶ 14} Jones told M.M. that she was going to take him to the courthouse and then she "was to go to the Prosecutor's Office and let them know that [she] wanted the charges dropped." Although M.M. took Jones to the courthouse and went to the prosecutor's office, she did not ask for the charges to be dropped. Instead, she told the victim advocate that Jones wanted her to sign an affidavit so the charges could be dropped, she did not want to sign an affidavit, and she was scared and "didn't know what was going to happen." Soon after, Jones called M.M. to tell her to pick him up from the courthouse.

{¶ 15} When M.M. picked Jones up, he was "screaming and yelling at" her and told her that she "needed to fix this." M.M. gave him a ride to the adult probation department. When they got there, Jones told M.M. to park at a nearby gas station to wait for him. While she was in the gas station parking lot, someone from the probation department came up to her car and asked if she was M.M. When she confirmed that she was, the person from the probation department "told [her] that [she] could not be there with Antonio and to go to the police department." M.M. went to the police department and filed a report about this incident.

{¶ 16} Since February 2023, she had gotten one text message from Jones asking if he could call her, and had received three phone calls from the jail that she did not accept. She had not had any in-person interactions with Jones.

6.

{¶ 17} During M.M.'s testimony, the state asked her about an incident between her and Jones in 2018. M.M. testified that they had gone to a basketball game in Cleveland, and as they were driving home, M.M. told Jones that she had seen text messages to other women on his phone and wanted to end their relationship. Jones got "very angry" with her and hit her, "threw [her] head against the window," twisted her arm and threatened to break it, choked her, and pulled her back into the car by her hair when she tried to leave. Jones was charged because of this incident. While he was in jail, he called M.M. as often as 28 times a day. During those conversations, he would tell M.M. not to come to court and "would always say 'no face, no case'." She understood that to mean that if she did not come to court, Jones would not be convicted. M.M. did not go to court because she was "afraid of the repercussions" from Jones or his family members, who had also contacted her while Jones was in jail. When Jones got out of jail, he returned to Mississippi.

{¶ 18} On cross-examination, M.M. testified that she and Jones had been together off and on since 2017. She denied that they were in a relationship in January 2022. She bought him a car but said that it was "[n]ot by choice" that she spent money on Jones. Although M.M. had given Jones $7,000 a couple of days earlier, she explained that Jones would take her to the bank and stand behind her. She did not tell anyone at the bank that she was being robbed because she was "scared for [her] life with this man."

{¶ 19} When M.M. went to the bar in Fremont to get her car back from Jones, she tried to get her key from him and leave, which led to their altercation in the parking lot.

7.

She took Jones back to her house "[b]ecause of the parking lot incident . . . ." She did not try to contact law enforcement while she was at the bar. Jones "insisted on coming back" to Sandusky with M.M.; she did not leave him at his brother's house in Fremont because she was afraid and Jones "always shows back up at [her] house."

{¶ 20} Jones was either passed out or asleep in M.M.'s car when she got back to her house. She woke him up to tell him that she did not want him in her life anymore. She denied that Jones followed her into her house because she had his phone.

{¶ 21} M.M. reported the 2018 incident to the police when she was pulled over for speeding. Other than that, she had not reported Jones for robbing her or forcing her to do things she did not want to or told anyone that she was scared of Jones. She tried to get a protection order against Jones but was unsuccessful for procedural reasons.

{¶ 22} On redirect, M.M. explained that she would give Jones money after he came into her house demanding money and screaming and yelling at her. She reported Jones's request for money to police in August 2021,[1] but the police did not take any action.

{¶ 23} Jones physically abused M.M. a couple of days before the 2018 incident by hitting her. The night of the 2018 incident, M.M. told Jones that she could not be with him and he needed to leave her alone.

---

[1] The state referred to this incident as happening in 2022, but in Dillinger's body camera video from January of 2022, M.M. told Dillinger that she had reported Jones to the police for taking money the previous August, i.e., August 2021.

8.

{¶ 24} Dillinger, one of the officers who responded to M.M.'s 911 call, testified that he was called to the scene because of a potential domestic violence situation. When he got there, he saw M.M. sitting in a car. She was "visibly upset," had blood on her face and hands, and told him that she had been assaulted. He recalled that she had a bloody nose, bruising on her left triceps, and hair pulled out of her head. He thought that these injuries looked "[r]ecent."

{¶ 25} While M.M. was discussing the evening's events, she told Dillinger that Jones had taken money from her. Although M.M. said that Jones stole money from her, she admitted that she voluntarily gave him the money. She explained that "there was no threat made, but she was in fear of him." She also told Dillinger about the police report she made in 2021 regarding stolen money. Dillinger was the officer who took that report. While he was running reports to learn more about M.M. and Jones, M.M. left. Dillinger called her to get her to come back to answer more questions, but she did not follow up on the matter. She did not report any physical violence in 2021.

{¶ 26} When Dillinger spoke with Jones, Jones denied causing M.M.'s injuries. He told officers several times to get his phone out of M.M.'s car. Dillinger did not see any damage to the house's screen door. Even if the screen door had been locked, someone could have pushed it open because such doors are "not very secure in general."

{¶ 27} The state played video from Dillinger's body camera video for the jury. In it, M.M. is sitting in the driver's seat of her car with the door open when Dillinger approaches her. She is crying and appears upset. In response to Dillinger's question

9.

about Jones's relationship to her, M.M. says that he is not her boyfriend and describes him as a "very abusive man to [her]." Although Jones has never lived with her, he has her house key and shows up at her house. She explains that Jones "comes into [her] life," "takes money from" her, and "won't leave [her] alone." For example, she withdrew $7,500 from the bank that day to give to Jones and had recently withdrawn an additional $3,000 for him. She says that Jones "tells [her]" that he wants money, he does not ask, and "[o]f course [Jones] threatens" her because he is a "big guy." She tells Dillinger about reporting Jones to the police in August, but she thought that the officer "didn't care."

{¶ 28} M.M. shows Dillinger the bruises on her arm and the hair Jones pulled from her head. The video also shows blood under her nose. She reports that Jones had his arm wrapped around her face and neck and then yanked her hair but was unsure how she got the bloody nose.

{¶ 29} When Dillinger asks M.M. about the events from that night, she first says that she brought Jones back from Fremont, and when she went out to her car, "he just attacked [her]." She elaborates that she went out to her car to tell Jones that she had his phone and he had to leave, then went into the house and locked the door so he could not get in. Jones broke the screen door and chased her around the house. M.M. wanted to press charges. She also tells Dillinger about the 2018 incident and explains that she did not cooperate with the prosecution of that case because she was scared, and Jones's family members were "after" her.

10.

{¶ 30} When Dillinger walks up to Diaz, another responding officer who is with Jones, Diaz tells him Jones's version of events. According to Jones, M.M. saw some text messages on his phone, he did not put his hands on her, and they only had a verbal altercation. Jones appears agitated and upset. When Dillinger asks Jones about M.M.'s condition, Jones says that he "did not touch this lady" and M.M. "came to [him] just like this, acting like this." He also denies going into M.M.'s house or chasing her around the house. Multiple times throughout the video, Jones demands that Dillinger get his phone from M.M.'s car.

{¶ 31} After talking to Jones, Dillinger asks M.M. about the phone. At first, she says that she gave the phone back to Jones but then says that she gave it to the officers.

The state also briefly questioned Dillinger about body camera video from a third officer (who did not testify). A part of the video that the state did not play for the jury shows M.M. giving the officer Jones's phone.

{¶ 32} On cross, Dillinger said that Jones denied causing M.M. any physical harm, denied being in M.M.'s home that day, and was very adamant that M.M. had his phone. He admitted that his body camera video showed M.M. telling officers both that Jones had his phone and that she had given his phone to the officers. Jones did not cause any problems while he was being arrested.

{¶ 33} Diaz, another responding officer, testified that Jones was behind M.M.'s house when he arrived on the scene. Although Jones "started calm" during his interactions with Diaz, he eventually "became aggressive . . . with an attitude." Jones

11.

became agitated when Dillinger was speaking to M.M. He was very upset that M.M. had looked at his phone. Jones told Diaz that M.M.'s "old man" assaulted her, but he did not identify who that person was.

{¶ 34} The state also played video from Diaz's body camera for the jury. It shows Jones standing outside M.M.'s house, on the side opposite the driveway, when Diaz walks up. He tells Diaz that he and M.M. had been together for about four years, and, although it is not entirely clear, it sounds like he says "yeah" when Diaz asks if he lives at M.M.'s house. Jones reports that M.M. had gone through his phone and was "trippin'" about what she saw on it, lying, and "blowing shit out of proportion." He denies that anything physical happened and claims he would never physically hurt M.M. He also says that this will be M.M.'s "last time calling police on [him]" because he "don't play game." Diaz asks if that is a threat toward M.M. Jones's answer is unintelligible.

{¶ 35} After several minutes, Jones becomes more agitated because M.M. is "puttin' on," he did not like the way that the officers were looking at him, and he thought that the police would side with M.M. no matter what. He repeatedly says that M.M. has his phone and tells Diaz to get the phone from her. After the officers arrest Jones and they are walking to the police car, Jones says that M.M. is "lying like a motherfucker" and claims that M.M.'s "old man" hurt her, not him. As Diaz is putting Jones in the car, one of the officers tells him that he has Jones's phone.

{¶ 36} On cross, Diaz said that when he arrived, Jones was on the opposite side of the house from where M.M.'s car was parked. He thought that Jones was hiding. He did

12.

not see scratches, bruises, or anything else consistent with an assault on Jones's hands. In addition to being upset that M.M. had looked at his phone, Jones was also upset that M.M. still had possession of the phone. Diaz could not tell from the video whether Jones said "yeah" or "nah" when Diaz asked if he lived at M.M.'s house. Diaz understood that Jones and M.M. had a relationship.

{¶ 37} Nickles, the trial court's criminal court administrator, testified that one of the conditions of Jones's bond in this case was "hav[ing] no contact in any manner with the victim and the victim's family . . ." or M.M.'s home address. During Nickles's testimony, the state played video from Jones's arraignment, which shows the judge telling Jones that one condition of his bond is having no contact with M.M. or her family and advising him of the consequences of violating that bond condition.

{¶ 38} On cross, Nickles said that she did not know if Jones was served with the bond order.

{¶ 39} Frank, the chief of the Erie County adult probation office, testified that he was helping process bonds on the day of Jones's arraignment. He confirmed that the bond included a condition that prevented Jones from having contact with M.M.

{¶ 40} The probation department is about two blocks from the courthouse (i.e., within "[w]alking distance"). When Jones came to the office after his arraignment, Frank was standing outside the door while the department's bond officer worked with Jones. Jones was "not exactly happy with" his bond conditions because he did not think that he should have to report to the probation department. While the bond officer was explaining

13.

the bond conditions, Frank got a phone call from a victim advocate. The advocate told him that M.M. might have driven Jones to the probation office; he was tasked with determining whether M.M. was there. He saw a white SUV at a nearby gas station and went up to the driver to determine her identity. The driver, who identified herself as M.M., was "quite upset." She told Frank that Jones "was in the Probation Department and that he had coerced her into driving him to the arraignment and down to the Probation Department. He was highly upset with her because he felt that the charges should have been dropped." Frank told M.M. that "she needed to leave the [gas] station, not to have any contact with [Jones], and to go to the Sandusky Police Department and make a report . . . immediately." That was the extent of their conversation. Later, someone notified the department that M.M. had, in fact, gone to the police.

{¶ 41} Frank asked Jones who brought him to the probation department that day. Initially, he said "his peoples" brought him, but when Frank asked him to specify who those people were, he admitted that it was M.M. The probation officers explained to Jones that he could not have any contact with M.M. and they told her to leave. They also called the court to report the situation. Although the court did not immediately revoke Jones's bond, soon after, they learned that the state was filing further charges, and the court was revoking the bond.

{¶ 42} Frank was unaware of any changes to the no-contact provision after the trial court initially set bond.

{¶ 43} On cross-examination, Frank said that a defendant should be told in court (before meeting with the probation department's bond officer) about the conditions of their bond. The bond officer was explaining the bond conditions to Jones when Jones became upset about the condition requiring him to report.

{¶ 44} Henderson, an Erie County sheriff's deputy, testified solely to explain that a copy of a bond order, which includes bond conditions, is served to a defendant with the indictment before the defendant's arraignment. He did not have any knowledge of or involvement with Jones's case.

{¶ 45} On cross, Henderson said that some deputies read the indictment and bond conditions when they serve a defendant and some do not. He did not know if Jones could read and write.

{¶ 46} After Henderson's testimony, the state rested.

{¶ 47} Jones moved for acquittal under Crim.R. 29, arguing that the state had not proven any of the elements of aggravated burglary or intimidation. Regarding the intimidation charge, the state responded that a threat can be made by actions, without any words, so

> [Jones] saying "you have to do this" or "you're going to do this", certainly there can be implicit in that language, based upon history, which she understood to be a threat of physical harm to her, and based upon that, she acted out of that fear and did what she was instructed, to the point of actually going to the Prosecutor's Office and, fortunately, got intercepted to enable her to report the additional crime.

{¶ 48} The state argued that this was sufficient to allow the case to go to the jury.

{¶ 49} The trial court denied Jones's motion, finding that there was sufficient evidence to submit the case to the jury.

{¶ 50} The jury found Jones guilty of assault and intimidation, and not guilty of aggravated burglary. After the court announced the verdict, Jones moved for a judgment notwithstanding the verdict on the intimidation charge. The court denied his motion.

{¶ 51} Two weeks after trial, Jones filed a motion for acquittal under Crim.R. 29(C) on the intimidation charge. He argued he should be found not guilty of that charge because the jury found him not guilty of "the underlying criminal conduct." He also argued that the state failed to show that he used force or an unlawful threat of physical harm because it only presented evidence of M.M.'s subjective fear, which did not create an illegal act, instead of the required affirmative act by Jones. In response, the state argued that R.C. 2921.04 prohibited threatening a witness, threats can include a wide range of statements or conduct, and it was not required to prove an explicit threat of harm or force. It contended that the jury followed the law and the court's instructions when it determined that Jones's statements, conduct, or both constituted a threat of physical harm to M.M. if she did not do what he wanted. The trial court summarily denied the motion "based on the reason's [sic] set forth in the States [sic] Response, as well as the facts of this case."

{¶ 52} The trial court sentenced Jones to five months in jail for the assault conviction and 36 months in prison for the intimidation conviction. It ordered him to serve his sentences concurrently for an aggregate sentence of 36 months.

16.

**{¶ 53}** Jones now appeals, raising three assignments of error:

Assignment of Error I: The conviction is insufficient of evidence and contrary to the manifest weight of the evidence[.]

Assignment of Error II: The trial court erred, over objection, when it permitted the prosecution to submit substantial evidence of prior acts contrary to Evid. R. 404(B)[.]

Assignment of Error III: Trial counsel provided ineffective assistance of counsel under the Ohio and United States Constitutions in failing to communicate with the client and further to object to multiple instances of duplicative and prejudicial testimony related to bond violations, failing to cross examine and failing to request a lesser included instruction[.]

## II. Law and Analysis

**A. Jones's intimidation conviction is supported by sufficient evidence and is not against the manifest weight of the evidence.**

**{¶ 54}** We begin with Jones's first assignment of error, wherein he argues that his victim-intimidation conviction is not supported by sufficient evidence and is against the manifest weight of the evidence.[2]

### 1. Sufficiency of the Evidence

**{¶ 55}** In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). We must consider all of the evidence admitted at trial -- including any improperly admitted evidence that is the source of reversal for trial error. *State v. Gideon*, 2020-Ohio-6961, ¶ 29, citing *State v.*

---

[2] Jones does not contest his assault conviction under this assignment of error.

17.

*Brewer*, 2009-Ohio-593, ¶ 24-26. We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.* Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶ 56} As relevant here, to convict Jones of intimidation of a victim, the state was required to prove that Jones knowingly and by unlawful threat of harm to any person or property attempted to influence, intimidate, or hinder M.M., a crime victim, in prosecuting criminal charges. R.C. 2921.04(B)(1). A person acts "knowingly" when, regardless of his purpose, he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B).

{¶ 57} A threat includes "a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct." *State v. Cress*, 2006-Ohio-6501, ¶ 39. Threats can be direct or indirect, express or implied, and specific or nonspecific. *See id.* at ¶ 37; *State v. Hayes*, 2017-Ohio-7716, ¶ 35 (8th Dist.); *State v. Thompson*, 2024-Ohio-2112, ¶ 16 (12th Dist.); *State v. Myers*, 2016-Ohio-223, ¶ 10 (6th Dist.). The context of the threat is important. *State v. Thompson*, 2014-Ohio-1225, ¶ 19 (7th Dist.). Thus, the circumstances surrounding the threat and the relationship between

18.

the parties can be considered when determining whether the defendant conveyed a threat. *State v. Brown*, 2021-Ohio-3591, ¶ 24 (12th Dist.); *see also State v. Thomas*, 2004-Ohio-6458, ¶ 25 (6th Dist.) (considering history of defendant's relationship with victim, defendant's "words, 'I will see you later,' [] unaccompanied by any action other than [defendant] 'glaring' at [victim]" were sufficient to show an unlawful threat of harm).

{¶ 58} An "unlawful threat of harm" is "more than just a communication to a person that particular negative consequences will follow should the person not act as the communicator demands." *Cress* at ¶ 41. Instead, the making of the threat itself must be unlawful because it violates established criminal or civil law. *Id.* at ¶ 42. In other words, the threat—not the threatened conduct—must somehow violate the law. *State v. Ott*, 2008-Ohio-4049, ¶ 25 (11th Dist.), citing *Cress* at ¶ 38. To prove an unlawful threat of harm, the state must introduce evidence of an underlying civil or criminal violation that makes the threat, itself, unlawful. *See Cress* at ¶ 42-43.

{¶ 59} Some appellate courts (including ours) have held that the state is not required to specify a predicate offense and will find a threat unlawful if the record contains some evidence that the threat violated established civil or criminal law. *E.g., State v. Horn*, 2024-Ohio-369, ¶ 26 (6th Dist.); *State v. Armstrong*, 2009-Ohio-5941, ¶ 21 (9th Dist.); *State v. Mendez*, 2020-Ohio-3031, ¶ 63 (8th Dist.); *State v. Lauck*, 2023-Ohio-1433, ¶ 10-11 (3d Dist.). These cases all rely on the Eleventh District's decision in *Ott*, which we find should not be applied to cases decided by a jury.

19.

{¶ 60} As background, in *Cress*, the Supreme Court explicitly held that "the statutory language in R.C. 2921.04(B), proscribing intimidation by an 'unlawful threat of harm,' is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law." *Cress* at ¶ 42. As an example, the court explained that "where the making of a threat constitutes the offense of coercion, in violation of R.C. 2905.12, a misdemeanor, that offense would serve as a predicate offense for the crime of witness intimidation as proscribed by R.C. 2921.04(B), a felony." (Footnote omitted.) *Id.* It went on to find that there was insufficient evidence to support Cress's intimidation conviction because the state "failed to prove that Cress made an unlawful threat of harm, i.e., *it did not introduce evidence demonstrating the elements of any predicate offense*." (Emphasis added.) *Id.* at ¶ 43. In a footnote to that sentence, the court noted that "Cress was charged with the crime of extortion, in violation of R.C. 2905.11(A)(5), but the jury returned a verdict of not guilty on that charge[,]" implying that an extortion conviction would have supported the intimidation conviction. *Id.* at ¶ 43, fn. 2.

{¶ 61} In *Ott*, Ott was charged with retaliation under R.C. 2921.05(A), which also requires proof that the defendant made an "unlawful threat of harm," and the trial court convicted him after a bench trial. *Ott* at ¶ 16-18. In reviewing the sufficiency of the evidence, the Eleventh District stated, "[t]he Supreme Court of Ohio suggested [in *Cress*] that, to be unlawful, the threat itself must violate a predicate offense. . . . However, the court did not hold that the 'predicate offense' must be identified in the indictment or

20.

otherwise specified by the state." *Id.* at ¶ 26. The Eleventh District found that the "unlawful threat" element of Ott's retaliation conviction was supported by sufficient evidence because "[t]he trial court, serving as the trier of fact, could decide whether the threats made by Ott were lawful[,]" and the record contained evidence that Ott's actions constituted the criminal offenses of disorderly conduct and telecommunications harassment. *Id.* at ¶ 26-33.

{¶ 62} This approach is fine for reviewing a conviction from a bench trial because "[j]udges, *unlike juries*, are presumed to know the law." (Emphasis added.) *State v. Davis,* 63 Ohio St.3d 44, 48 (1992); *State v. Turner*, 2004-Ohio-5632, ¶ 15 (11th Dist.) ("[U]nlike a jury, *which must be instructed on the applicable law*, a trial court judge is presumed to know the applicable law and apply it accordingly." (Emphasis added.)). This means that a judge—who presumably knows what the law is and can recognize a violation of established civil or criminal law—should be able to "decide whether the threats made by [the defendant] were lawful", *Ott* at ¶ 26, without the state specifying what the underlying offense is. But, in a jury trial, the judge specifically tells jurors that "[i]t is your sworn duty to accept these [jury] instructions and apply the law as I give it to you. You are not permitted to change the law or to apply your own idea of what you think the law should be." *Ohio Jury Instructions*, CR § 207.01 (Rev. Dec. 11, 2010). In other words, juries are *not* presumed to know what the law is, *see Davis* at 48 and *Turner* at ¶ 15, and are required to consider and apply *only* the tenets of law that the court provides. In light of that, it is nonsensical to expect a jury to decide whether a threat is a

21.

violation of established civil or criminal law unless the court tells it what the established civil or criminal law *is*. For the court to do that, the state must provide it with some underlying offense on which it can instruct the jury.[3]

{¶ 63} Here, the state seemed to predicate the unlawfulness of Jones's threat on his violation of the no-contact provision of his bond, and there is some evidence in the record that Jones violated the no-contact provision. However, there is nothing in the jury instructions indicating that disobeying a bond condition is an established criminal or civil violation. Thus, because the jury was not given a legal basis for finding that Jones's bond violation was a civil or criminal offense, that violation cannot be used to show that his threat to M.M. was unlawful.

{¶ 64} However, the trial court did instruct the jury on the offense of menacing as part of its instructions on the aggravated burglary count. Under R.C. 2903.22(A)(1), it is a criminal offense for a person to knowingly cause another to believe that they will cause physical harm to the other person. Considering all of the evidence admitted at trial, based on M.M.'s testimony about her history with Jones and his actions the day of his

---

[3] To be clear, we are not holding that a predicate offense is an essential element of an intimidation charge under R.C. 2921.04(B) that the state must allege in the indictment and prove beyond a reasonable doubt. Instead, we are holding that the jury must be informed of some legal basis upon which it can conclude that beyond a reasonable doubt that the alleged threat was unlawful, i.e., a violation of established civil or criminal law. This could be accomplished by, for example, telling the jury that disobedience of a lawful court order is contempt of court, defining the elements of the underlying offense in the instructions for the victim-intimidation charge, or providing instructions for another count in the indictment that support a finding that the threat was unlawful (e.g., instructing on a coercion charge arising from the same incident as the intimidation charge).

22.

arraignment, a reasonable trier of fact could find that Jones's demands that M.M. sign an affidavit to get the charges against him dropped were a knowing attempt to cause M.M. to believe that he would cause her physical harm. Therefore, Jones's threat to M.M. was an unlawful threat of harm, and his intimidation conviction is supported by sufficient evidence.

## 2. Manifest Weight

{¶ 65} "When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Haas*, 2025-Ohio-683, ¶ 39 (6th Dist.), citing *Thompkins,* 78 Ohio St.3d at 387. We are not required to view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. We reverse on manifest weight grounds only in "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 66} In challenging the conviction based on the weight of the evidence, Jones initially claims that evidence showing that he violated his bond by contacting M.M. "caused the jury to lose its way and conflate a bond violation and other uncharged acts

23.

with witness intimidation." Specifically, Jones complains that his bond violation "is not an element [of] any of the crimes charged" against him and, thus, distracted the jury with prejudicial evidence and issues unrelated to the actual charge.

{¶ 67} We initially note that Jones's argument goes more to admissibility of the evidence than to its weight. As we discuss later in this opinion, evidence of Jones's bond violations is, in fact, relevant to the intimidation charge inasmuch as it demonstrates an awareness on the part of Jones that in reaching out to M.M. in violation of the conditions of his bond, he would probably intimidate M.M. against, or hinder her from, prosecuting him. *See* R.C. 2921.04(B)(1) (no person knowingly and by unlawful threat of harm shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges). Based on the evidence, we do not find that the jury either lost its way or created a miscarriage of justice in convicting Jones for victim intimidation.

{¶ 68} Jones next argues that the jury was led astray by the trial court's "improper instructions about what constitutes a threat." It is axiomatic that a trial court's instructions are not evidence and so have no place in a discussion of manifest weight. Moreover, as we discuss later in this opinion, the trial court's instructions to the jury were not improper. Therefore, we dismiss this argument as meritless.

{¶ 69} Finally, Jones argues that the jury was confused by the admission of "improper propensity evidence." That certain prior acts evidence was lawfully admitted

24.

is, likewise, discussed later in this opinion. That the lawfully-admitted prior acts evidence weighs in favor of, rather than against, Jones's conviction is undisputed.

{¶ 70} Jones's first assignment of error is not well-taken.

**B. The trial court erred by admitting evidence of the 2018 incident, but the error was harmless.**

{¶ 71} Jones argues in his second assignment of error that the trial court erred by admitting prior acts evidence of the 2018 incident during which he allegedly assaulted M.M. and told her not to cooperate with prosecuting the charges. He contends that there was no real question regarding his identity as the perpetrator, the evidence did not show that he had a specific modus operandi, the incident's probative value was outweighed by its prejudicial effect, and the trial court's limiting instruction was not sufficient to cure the prejudice.

{¶ 72} In response, the state argues that the 2018 incident was evidence of Jones's motive and intent when he entered M.M.'s house in January 2022, relevant to showing that Jones intimidated M.M., helped establish Jones's identity as the perpetrator, and showed his "modus operandi in responding to M.M. looking at his phone." It also contends that the probative value of the 2018 incident was not outweighed by the danger of unfair prejudice because M.M.'s testimony "was limited to the fact that [Jones] had previously attacked her and intimidated her into dropping the charges[,]" the trial court's limiting instruction minimized the risk of unfair prejudice, and, if the court did err in admitting the evidence, the error was harmless.

25.

{¶ 73} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." That evidence may be admissible for other purposes, however, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "The list of permitted purposes in Evid.R. 404(B) is not exhaustive." *State v. O.E.P.-T.*, 2023-Ohio-2035, ¶ 154 (10th Dist.), citing *State v. Morris*, 2012-Ohio-2407, ¶ 18. "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 2020-Ohio-4440, ¶ 22.

{¶ 74} To determine whether evidence of other acts is admissible, the first step is determining whether the evidence is relevant in two respects: (1) to the particular purpose for which it is offered—i.e., a non-character-based purpose, as allowed by Evid.R. 404(B)—and (2) to an issue that is actually in dispute—i.e., an issue that is material to the case, as required by Evid.R. 401. *State v. Smith*, 2020-Ohio-4441, ¶ 37-38, citing *Hartman* at ¶ 26-27; *State v. Williams*, 2012-Ohio-5695, ¶ 20. Additionally, a threshold showing of "'substantial proof'" that the defendant is the person who committed the alleged other acts is required as part of the court's relevancy determination. *Hartman* at ¶ 28, quoting *State v. Carter*, 26 Ohio St.2d 79, 83 (1971).

{¶ 75} If the evidence passes these relevancy tests, the final step to determine its admissibility is considering, under Evid.R. 403(A), whether the value of the evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or

26.

of misleading the jury." *Smith* at ¶ 38, citing *Hartman* at ¶ 29; *Williams* at ¶ 20. Generally speaking,

> [i]f the fact that the proponent seeks to prove by way of other acts is not genuinely disputed or material to the case, then it has little probative value and the risk of prejudice is high. As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases.

(Emphasis in original and internal citations omitted.) *Hartman* at ¶ 31.

{¶ 76} The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that we review de novo. *State v. Worley*, 2021-Ohio-2207, ¶ 117, citing *Hartman* at ¶ 22. But the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant under Evid.R. 403(A) involves an exercise of judgment, so we review that decision for an abuse of discretion. *Id.*, citing *Hartman* at ¶ 30.

{¶ 77} In this case, the state offers three bases for the admission of the 2018 incident: identity, motive, and intent.

### 1. Identity

{¶ 78} We first turn to whether the trial court properly admitted M.M.'s testimony about the 2018 incident as evidence of Jones's identity. Jones argues that there is not "any real question of identity" in this case, so admission of the 2018 incident did not help determine who committed these crimes. The state points to Jones's statement that M.M.'s "old man" caused her injuries to argue that Jones's identity was at issue, and

27.

claims that the trial court properly admitted the testimony to show that Jones was, in fact, the person who assaulted M.M.

{¶ 79} Other acts can be used to prove identity in two situations. The first is when the other acts form part of the "immediate background" for the acts that are the basis of the crime charged in the indictment and are "inextricably related to the alleged criminal act." (Internal quotations omitted.) *State v. Graham*, 2020-Ohio-6700, ¶ 88, citing *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994); and *State v. Curry*, 43 Ohio St.2d 66, 73 (1975). The second is when the acts establish a modus operandi—a "unique identifiable plan of criminal activity . . ." with "signature, fingerprint-like characteristics unique enough to show that the crimes were committed by the same person." (Internal quotations omitted.) *Id.*, citing *Lowe* at 531; *State v. Jamison*, 49 Ohio St.3d 182 (1990), syllabus; and *Hartman* at ¶ 37. Either way, for the state to use Evid.R. 404(B) evidence, identity must be a material issue that is actually in dispute. *Worley* at ¶ 118. "Identity is at issue when the fact of the crime is open and evident, but the perpetrator is unknown, and the accused denies that he or she committed the crime." *State v. Elliott*, 2024-Ohio-3376, ¶ 136 (10th Dist.); *compare Hartman* at ¶ 39 (identity was not at issue because victim knew defendant and the defense theory did not involve misidentification).

{¶ 80} Here, Jones's identity as the perpetrator was not a disputed material issue. Although Jones told the officers the night of the incident that he did not harm M.M. and her "old man" was responsible for her injuries, nothing else in the record indicates that Jones was actually disputing that he was the perpetrator—defense counsel's closing

28.

argument focused on Jones's actions not meeting the elements of the charged crimes—or that the perpetrator was unknown. Because identity was not truly disputed, the state could not properly introduce other-acts evidence to show that Jones was the person who committed these offenses.

### 2. Motive

{¶ 81} Next, the state claims, without offering any analysis, that the 2018 incident was evidence of Jones's motive. "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman* at ¶ 48. For example, "a defendant's motive in committing a theft might be to sell the stolen item to get money to buy drugs," or a defendant may have "committed murder to cover up an earlier crime." *Id.* Importantly, "[t]here need be no similarity between the other-acts evidence and the crime charged under a motive theory; 'a dissimilar prior act is just as feasible in supplying a motive for committing a crime as is a similar prior act.'" *Id.*, quoting Weissenberger, *Federal Evidence*, Section 404.16 (7th Ed. 2019).

{¶ 82} Nothing about the 2018 incident points to a specific reason that Jones committed the crimes charged in this case. *See id.* at ¶ 49 ("Here, the evidence plainly was not admissible for purposes of establishing motive. Hartman's molestation of his former stepdaughter does not reveal a specific reason for raping [the victim] and thus does not provide evidence of any motive to commit rape beyond that which can be inferred from the commission of any rape."). Because the 2018 incident does not show motive, the state could not properly introduce the other-acts evidence on this basis.

29.

### 3. Intent

{¶ 83} Finally, the state claims that the 2018 incident was evidence of Jones's intent "in entering M.M.'s home and by subsequently telling her to get the charges against him dropped." Specifically, it argues that the 2018 incident was "relevant to demonstrate [Jones's] motive and intent to commit a criminal offense when entering M.M.'s home . . ." and to "establishing that [Jones] knowingly attempted influence or intimidate M.M. by unlawful threat of harm into going to the prosecutor's office to sign an affidavit to get the charges against him dropped[,]" but again does not explain *how* the 2018 incident shows Jones's intent.

{¶ 84} Although intent is an element of most crimes, it generally is not a material issue for Evid.R. 404(B) purposes unless it is either genuinely disputed or the defendant is charged with a specific-intent crime. *Hartman* at ¶ 55. "[I]ntent evidence is not admissible when 'the requisite intent is presumed or inferred from proof of the criminal act itself' . . . ." *Id.*, quoting 1 *Wharton's Criminal Evidence*, § 4:31 (15th Ed. 2019). The Ohio Supreme Court has warned that "courts should use caution when evaluating whether to admit other-acts evidence for the purpose of showing intent . . ." because "[t]here is a thin line between the permissible use of other-acts evidence to show intent and the impermissible use to show propensity." *Id.* at ¶ 57-58. The difference between permissible and impermissible other-acts evidence "turns on whether it is more probative of the defendant's *intent* to commit the charged act or of the defendant's inclination to

commit similar crimes." (Emphasis in original.) *State v. McDaniel*, 2012-Ohio-724, ¶ 21 (1st Dist.). To determine whether the other acts are probative of intent,

> the question is whether, "under the circumstances, the detailed facts of the charged and uncharged offenses strongly suggest that an innocent explanation is implausible." . . . Or to put it another way, the other-acts evidence "must be so related to the crime charged in time or circumstances that evidence of the other acts is significantly useful in showing the defendant's intent in connection with the crime charged."

(Emphasis omitted.) *Hartman* at ¶ 58, quoting Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, § 7.5.2 (2d Ed. 2019); and 1 *Wharton's Criminal Evidence* at § 4:31.

{¶ 85} Here, the 2018 incident was not admissible as evidence of Jones's intent to intimidate M.M. Victim intimidation under R.C. 2921.04(B) is not a specific-intent crime (i.e., the state does not have to prove that the offender specifically intended to cause a certain result or engage in certain conduct), and the offender's intent (i.e., to influence, intimidate, or hinder the filing or prosecution of criminal charges) is presumed from proof of the crime itself.

{¶ 86} Regarding the aggravated burglary charge, the 2018 incident was relevant to a disputed issue because aggravated burglary is a specific-intent crime. However, the 2018 incident is still not admissible under Evid.R. 404(B) because it is not so similar to the charged burglary that it strongly suggests that Jones's innocent explanation for entering M.M.'s house is implausible. *Hartman* at ¶ 58. Although the two events share some similarities, the precipitating events were different (M.M. ending their relationship in 2018 versus M.M. telling Jones to leave her alone in 2022), there is no evidence that

31.

M.M. had possession of Jones's property during the 2018 incident, and Jones's behavior after his arrest was distinctly different (calling from jail and telling M.M. not to come to court in 2018 versus seeing M.M. in person and telling her to sign an affidavit in 2022). Because of these differences, the 2018 incident is not "'significantly useful in showing [Jones's] intent in connection with the crime charged.'" *Id.*, quoting 1 *Wharton's Criminal Evidence* at § 4:31. On balance, we find that the 2018 incident is more probative of Jones's inclination to commit similar crimes than it is of his intent to commit the charged crimes. Therefore, intent is not a proper purpose for introducing the other-acts evidence.

### 4. Harmless error

{¶ 87} However, even though we find error, we must measure that against the harmless error standard in determining whether we should reverse this case by considering three factors: (1) There must be prejudice to the defendant as a result of the admission of the improper evidence at trial; (2) an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt, i.e., that there was no reasonable possibility that the testimony contributed to the accused's conviction; and (3) in determining whether the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence to determine if it establishes the defendant's guilt beyond a reasonable doubt. *State v. Kinney*, 2025-Ohio-1620, ¶ 51, (6th Dist.)  quoting *State v. Harris,* 2015-Ohio-166, ¶ 37,

32.

142 Ohio St.3d 211, citing *State v. Morris,* 2014-Ohio-5052, ¶ 22–29, 141 Ohio St.3d 399.

{¶ 88} The first step in this analysis is to excise the 2018 incident from the testimony.  The victim testified with respect to all of the elements of the Assault and the Aggravated Burglary charge when she described the January 23, 2022 encounter with the appellant.

*The Assault Charge*

{¶ 89} The victim described in graphic detail how she was chased throughout her own house. She then fled out of her own house and into her car. She further described how appellant pulled out some of her hair and began to choke her.  The OnStar system in the vehicle was activated.  She told the operator that she needed help.  Ultimately, the victim called 911 and police responded.

{¶ 90} There were numerous photographs admitted into evidence that demonstrated injuries to the victim.  These included visible injuries to the nose, arm and neck, all from the altercation that occurred on January 23, 2022.

{¶ 91} Based upon her own testimony, having excised the 2018 incident, we cannot find prejudice to the appellant as a result of the admission of this specific improper evidence at trial.

{¶ 92} Therefore, we cannot declare a belief that the error was not harmless beyond a reasonable doubt and that no reasonable possibility that the testimony concerning the 2018 incident contributed to Jones' conviction on the Assault charge.

33.

*Aggravated Burglary Charge*

{¶ 93} Jones was acquitted on the Aggravated Burglary charge. Even if the trial court did err in weighing the possible danger of unfair prejudice in this case, the error is harmless, given the jury's verdict, which included an acquittal on the principal charge of aggravated burglary, thereby rebutting any claim that admission of the disputed evidence tainted the jury's view of Jones or otherwise unfairly impacted the verdict. *See Sims* at ¶ 101 (where jury found appellant not guilty of one of three charged rape offenses, any arguable error that stemmed from the admission of certain other acts evidence was determined to be harmless); *see also O.E.P.-T.* at ¶ 160 (jury's verdict, which included acquittals on four counts, was sufficient to show harmlessness of admission of other acts evidence).

*The Intimidation Charge*

{¶ 94} With respect to the Intimidation charge, once the 2018 incident is extracted from the testimony, there remained the compelling testimony of Chief Probation Officer Mike Frank. Mr. Frank was Chief of Police prior to his position as Chief of the Erie County Adult Probation Department. He had direct and personal contact with Jones and the victim on February 28, 2023. This is the date indicated on the grand jury indictment as being the date of this offense.

{¶ 95} Frank testified that he had received a phone call from the Victim's Advocate. He was told that the victim may have been forced or coerced to bring Jones down to the Probation Department where his bond conditions were being arranged. He

34.

was told that the victim was in the car in the BP gas station across the street. Frank left the building and approached the car. The victim was in the car and was quite upset. She said that Mr. Jones was in the Probation Department and that he had coerced her into driving him to the arraignment and down to the Probation Department. He was highly upset with her because he felt that the charges should have been dropped. Frank then advised her she needed to leave the BP station, not to have any contact with Jones and to go to the Sandusky Police Department and make a report.

{¶ 96} Therefore, based upon the entirety of the testimony, we cannot find the 2018 incident was prejudicial to appellant, particularly given the additional, essentially eyewitness testimony of the Chief Probation Officer concerning the Intimidation charge. Furthermore, we cannot declare a belief that the error was not harmless beyond a reasonable doubt.

{¶ 97} Appellant's second assignment of error is found not well-taken and denied.

### C. Jones failed to establish that his trial counsel was ineffective.

{¶ 98} In his third assignment of error, Jones contends that his trial counsel was ineffective by: (1) not maintaining sufficient pre-trial contact with him; (2) not objecting to testimony about his bond violations; and (3) not objecting to the jury instruction defining an "unlawful threat."

{¶ 99} A claim of ineffective assistance of counsel requires that a defendant satisfy two elements: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning

35.

as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *State v. Bradley*, 42 Ohio St.3d 136(1989), paragraph three of the syllabus. "Judicial review of trial counsel's performance must be highly deferential." *State v. Owens*, 2025-Ohio-2035, ¶ 82 (6th Dist.), citing *State v. Greer,* 2023-Ohio-103, ¶ 15.

### 1. Pre-Trial Communication

{¶ 100} Jones first contends that his trial counsel was ineffective for failing to maintain "necessary" pretrial communication with him. "A trial attorney's failure to communicate with his or her client may rise to the level of deficient performance, depending on the circumstances." *State v. Lawson*, 2020-Ohio-6852, ¶ 106 (2d Dist.). But "'a claim of lack of communication between a defendant and his trial counsel is not one that can be borne out by the record [because] [i]t relies upon information necessarily outside the record.'" (Quotation omitted.) *State v. Allison*, 2024-Ohio-872, ¶ 22 (6th Dist.), quoting *State v. Lawson*, 2020-Ohio-6852, ¶ 106 (2d Dist.).

{¶ 101} Jones argues that this case is an "outlier" because the record contains sufficient evidence to demonstrate ineffective assistance for failure to communicate in the direct appeal -- specifically "significant and lengthy proffers" by Jones detailing the lack of communication, "confirmation of such" by Jones's trial attorney, as well as an

36.

"explanation from the trial attorney as to why there was a breakdown in communication prior to trial."

{¶ 102} The facts surrounding Jones's representation are as follows. Jones was initially represented by Attorney Wisehart, who filed a notice of appearance on March 13, 2023. Attorney Wisehart moved to withdraw from the case in April 2023, stating that "a breakdown ha[d] occurred in the attorney/client relationship which [made] further representation of [him] impossible." Jones's second attorney, Attorney Clifford, entered a notice of appearance on June 15, 2023. Attorney Clifford immediately filed for discovery and requested a continuance.

{¶ 103} At an August 29, 2023 pretrial hearing, Jones stated that it was his first time meeting with Attorney Clifford. On the first day of trial, Jones requested that he be allowed to get a new attorney. He stated that he had just received discovery two days prior. The trial court denied Jones's request, as the jury had already been impaneled. On the second day of trial, Jones claimed that counsel had "not come to [him] and talk to [him]…at the jail like he supposed to," but admitted that Attorney Clifford had come and talked to him over the weekend. Jones also claimed that Attorney Clifford had not showed him all of the evidence or asked him about his defense. On the third day of trial, Jones again claimed that Attorney Clifford had not come and talked to him in jail. Jones stated, "So I don't ask my attorney nothin' because he's not my attorney. This is y'all prosecutor, not my attorney. He a prosecutor." Attorney Clifford responded: "That's why I don't come in to see you…. Bad attitude."

37.

{¶ 104} The state points out that it is impossible to tell from this record the extent of the communication between Jones and Attorney Clifford and that, even assuming Attorney Clifford only met with Jones once in jail, it cannot be determined from the record what, if any, other types of communication may have occurred. "Jail inmates have the right to send letters involving their case to legal counsel and to receive confidential correspondence from legal counsel. Inmates also have access to telephones for direct calls to counsel and can use three-way calling via friends and/or family to communicate with counsel." *State v. Miller,* 2009-Ohio-3621, ¶ 8 (10th Dist.). Based only on the record before us, we cannot say that Attorney Clifford's communication with Jones was deficient.

{¶ 105} Furthermore, again assuming that Jones's claims are true, Jones has also failed to demonstrate a reasonable probability that the outcome of the trial would have been different if there had been better communication with counsel. The record does not demonstrate that but for the alleged communication difficulties between Jones and his trial counsel the results of the proceedings would have been different.

### 2. Objecting to Testimony about Bond Violation

{¶ 106} Jones also contends that his trial counsel was ineffective in failing to object to testimony about his bond violations. According to Jones, "issues related to bond violations were not relevant to any of the charges" he faced. We find, to the contrary, that evidence of Jones's bond violations are relevant to the intimidation charge inasmuch as it demonstrates an awareness on the part of Jones that in reaching out to M.M. in violation

38.

of the conditions of his bond, he would probably intimidate M.M. against, or hinder her from, prosecuting him. *See* R.C. 2921.04(B)(1) (no person knowingly and by unlawful threat of harm shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges).

{¶ 107} Jones further contends that even if evidence of the bond violations was relevant to the intimidation charge, the probative value was substantially outweighed by the danger of unfair prejudice to the extent that this evidence portrayed Jones as someone who has a propensity to break the rules. We need not determine this issue, however, because even if we were to assume Jones's trial counsel was somehow deficient for failing to object to testimony concerning his bond violations, Jones has not established a reasonable probability that doing so would have resulted in a different outcome in the proceedings.

### 3. Objecting to Jury Instruction

{¶ 108} Finally, Jones contends that his trial counsel was ineffective for failing to object to the jury instruction defining an "unlawful threat of harm."

{¶ 109} The trial court instructed the jury: "An unlawful threat of harm has occurred when the very making of the threat is unlawful because it violates established criminal or civil law. The threat may be an indefinite one and nonspecific." Jones contends that the instruction was "not an accurate reflection of the law" because an "'unlawful threat of harm' has occurred *only* when the very making of the threat is itself unlawful because it violates criminal or civil law." (Emphasis in original.)

39.

{¶ 110} As we discuss above in our analysis of Jones's claim regarding sufficiency of the evidence, the statutory language in R.C. 2921.04(B), proscribing intimidation by an 'unlawful threat of harm,' is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law." *Cress*, 2006-Ohio-650, at ¶ 42. Thus, the state must show that the threat itself, rather than the threatened conduct, is unlawful. *Id.*

{¶ 111} The first sentence of the trial court's instruction addresses the fact that the making of an unlawful threat of harm must violate criminal or civil law. The court's instruction that an unlawful threat of harm may be "indefinite" and "nonspecific" is also a correct statement of the law. Indeed, the Ohio Supreme Court recognized in *Cress* that "[t]he most intimidating threat of all may be an indefinite one[.] *Cress* at ¶ 37. Because the court's instructions were consistent with the Ohio Supreme Court's decision in *Cress*, defense counsel was not deficient in not objecting to them.

{¶ 112} For the foregoing reasons, Jones's third assignment of error is found not well-taken.

### III. Conclusion

{¶ 113} Based on the foregoing, the January 2, 2024 judgment of the Erie County Court of Common Pleas is affirmed.  Jones is ordered to pay the costs of this appeal under App.R. 24.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See, also,* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Myron C. Duhart, J.

_____
JUDGE

Christine E. Mayle, J.
DISSENTS AND WRITES
SEPERATLEY

**MAYLE, J., dissenting**

{¶ 114} Appellant, Antonio Jones, was convicted by a jury of intimidation of a victim in violation of R.C. 2921.04(B)(1), a third-degree felony. A significant part of the evidence that the state used to convict Jones was from an event that happened between him and the victim, M.M., in 2018—about five years before the events underlying the victim-intimidation charge occurred. As the majority finds, this evidence was inadmissible under Evid.R. 404(B). However, I respectfully dissent because, contrary to the majority's conclusion, the trial court's error was not harmless beyond a reasonable doubt.

{¶ 115} In 2018, Jones allegedly assaulted M.M. and told her not to cooperate with prosecuting the resulting charges. He was charged in this case with similar behavior. The state argues that the 2018 incident was admissible under Evid.R. 404(B) because it showed Jones's identity, modus operandi, and motive and intent. I agree with

41.

the majority's conclusion that evidence of the 2018 incident was not admissible as evidence of identity, modus operandi, or motive and intent, and the state does not argue that the evidence was admissible for any other purpose. However, I disagree with the majority's conclusion that the trial court's error was harmless.

{¶ 116} Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights . . . ." Crim.R. 52(B). The state bears the burden of proving that the error did not affect a defendant's substantial rights. *State v. Moore*, 2021-Ohio-765, ¶ 37 (6th Dist.), citing *State v. Morris*, 2014-Ohio-5052, ¶ 23; and *State v. Perry*, 2004-Ohio-297, ¶ 15.

{¶ 117} When determining whether a trial court's improper admission of other-acts evidence affected the substantial rights of a defendant, an appellate court must (1) determine whether the error prejudiced the defendant (i.e., the error affected the verdict), (2) declare a belief that the error was not harmless beyond a reasonable doubt, and (3) excise the improper evidence from the record, look to the remaining evidence, and determine whether there is evidence beyond a reasonable doubt of defendant's guilt. *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *Morris* at ¶ 25, 27-29, 33. In other words, "an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris* at ¶ 33.

{¶ 118} First, the admission of testimony about the 2018 incident prejudiced Jones. Other-acts evidence admitted in violation of Evid.R. 404(B) is particularly likely

42.

to result in prejudice—that is, to affect the verdict—when "'the other acts are very similar to the charged offense or of an inflammatory nature.'" *State v. Sargent*, 2015-Ohio-704, ¶ 31 (6th Dist.), quoting *State v. Miley*, 2006-Ohio-4670, ¶ 58 (5th Dist.). Prejudice is also more likely to result when the other acts are emphasized by the state in making its case against the defendant. *Morris* at ¶ 31 ("[T]he actions of a prosecutor may combine with an evidentiary error to cause greater impact.").

{¶ 119} The testimony about the 2018 incident met both criteria. Not only did M.M. testify that Jones injured her in similar ways (pulling her hair and choking her) and pushed her to not cooperate with the state so that the charges would be dismissed, but the prosecutor also heavily relied on the 2018 incident in her closing argument. For example, she told the jury,

> We heard about that isolated incident back in 2018 that almost mirrors this exactly. I went through, I looked at his phone. He got mad, he assaulted me, and then for that he was charged . . . .
>
> . . .
>
> And you heard about 2018. You heard [M.M.] describe the nature of their relationship and the fear that he instilled in her[].
> . . .
>
> And we know that a year later, when [Jones was] at . . . the Probation Department, that he was acting very aggressively and angry about the fact he had to report. So if reporting is enough to make him angry, . . . then the events of January 23rd of 2022 certainly escalated him to engage in the behavior that he had done in 2018 under a similar circumstance.

Although some of the state's arguments addressed Jones's intent related to the burglary charge, in making these comparisons, the state was not attempting to identify Jones or

43.

explain his motive or M.O.; the state was primarily attempting to show that Jones repeated his 2018 crimes in this case. This argument directly played into the "long recognized" dangers of admitting other acts evidence, i.e., that the jury will convict the defendant not because he is guilty in *this* case, but "'because he is a person likely to do such acts'" or "'because he has escaped punishment from other offenses.'" *State v. Clemons*, 2017-Ohio-7980, ¶ 15 (6th Dist.), quoting *State v. Curry*, 43 Ohio St.2d 66, 68 (1975). Thus, the testimony about the 2018 incident prejudiced Jones and affected the verdict.

{¶ 120} Second, "an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt." *Morris* at ¶ 28. "'Error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction[.]'" *Id.*, quoting *State v. Lytle*, 48 Ohio St.2d 391 (1976), paragraph three of the syllabus, *vacated in part on other grounds,* 438 U.S. 910 (1978). Given the state's heavy reliance on the 2018 incident, there is no reasonable possibility that testimony about the 2018 incident did *not* contribute to Jones's conviction.

{¶ 121} Finally, the reviewing court must excise the improper evidence and look at the remaining evidence in the case to determine whether there is evidence beyond a reasonable doubt of guilt. "'[C]ases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.'" *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986),

44.

quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983). A reviewing court's role in this inquiry is "'not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony upon the jury.'" *Morris* at ¶ 29, quoting *Rahman* at 151, fn. 4. The state bears the burden of demonstrating that the error did not affect the defendant's substantial rights. *Id.* at ¶ 23.

{¶ 122} I do not dispute that M.M.'s testimony about the assault was sufficient to make the trial court's error harmless as to that conviction, even disregarding the evidence related to the 2018 incident. But the remaining evidence is wholly insufficient to prove victim intimidation beyond a reasonable doubt because there is not overwhelming evidence of Jones's guilt or some indicia that the evidence did not affect the verdict.

{¶ 123} As relevant here, to convict Jones of intimidation of a victim, the state was required to prove that Jones knowingly and by unlawful threat of harm to any person or property attempted to influence, intimidate, or hinder M.M., a crime victim, in prosecuting criminal charges. R.C. 2921.04(B)(1). To be unlawful, the threat itself—not the threatened conduct—must constitute a violation of established criminal or civil law. *State v. Cress*, 2006-Ohio-6501, ¶ 42; *State v. Ott*, 2008-Ohio-4049, ¶ 25 (11th Dist.), citing *id.* at ¶ 38.

{¶ 124} The majority points to the "compelling testimony" of Mike Frank, the chief probation officer in Erie County, to show that the remaining evidence proved the intimidation charge beyond a reasonable doubt. Frank testified that he got a call from a victim advocate, who told him that M.M. might have driven Jones to the probation office.

45.

When he saw a vehicle parked at a nearby gas station and went outside to investigate, he determined that M.M. was the driver. She was "quite upset" and told him that Jones "was in the Probation Department and that he had coerced her into driving him to the arraignment and down to the Probation Department. He was highly upset with her because he felt that the charges should have been dropped. . . . That was the extent of [Frank's] conversation with her." There is absolutely nothing in this testimony that shows that Jones made *any* threat—let alone an unlawful threat of harm—to M.M. At best, Frank's use of the word "coerced" *might* suggest the presence of some unlawful behavior. But Frank did not testify to *anything* that remotely resembles a threat (i.e., "statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct"). *Cress* at ¶ 39. Additionally, the state relied heavily upon Jones's history with M.M.—which it primarily presented to the jury through the 2018 incident—to prove that his behavior in 2023 was threatening to her. Considering all of this, I simply cannot say that the admission of evidence of the 2018 incident was harmless beyond a reasonable doubt.

{¶ 125} The state points to the trial court's limiting instructions to claim that any Evid.R. 404(B) error was harmless. But the adequacy of those instructions is irrelevant. Limiting instructions "are not designed to 'cure' any errors. Rather, they are designed to mitigate the prejudicial effect of evidence that is, presumably, *otherwise admissible* under Evid.R. 404(B) by explaining to the jury that it may consider the evidence or testimony

46.

for certain allowable, limited purposes only." (Emphasis in original.) *State v. Kamer*, 2022-Ohio-2070, ¶ 149 (6th Dist.). Testimony about the 2018 incident was inadmissible under Evid.R. 404(B), so there was no allowable purpose for which the jury could consider it *at all*. The trial court giving limiting instructions does not change that.

{¶ 126} For these reasons, I dissent from the majority's conclusion that the trial court's error in admitting evidence of the 2018 incident was harmless. Because of that, I would reverse the trial court's decision. I would also remand the case for a new trial because I agree with the majority that, when looking at all of the evidence admitted at trial (not just the properly admitted evidence), the state presented sufficient evidence to support Jones's intimidation conviction. Additionally, I would find that the part of Jones's first assignment addressing the manifest weight of the evidence and his third assignment of error are moot.

---

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.